**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| PATTERSON 357, LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>HEIDELBERG MATERIALS MIDWEST<br>AGG, INC.,<br><br>   Defendant. | Case No. 1:23-cv-02831 |

**AGREED APPLICATION TO CONFIRM
AND ENTER JUDGMENT ON ARBITRAL AWARD**

Plaintiff PATTERSON 357, LLC ("Plaintiff" or "Patterson") and Defendant Heidelberg Materials Midwest AGG, Inc. ("Defendant" or "Heidelberg"), by and through their respective attorneys, state for their Agreed Application to Confirm and Enter Judgment on Arbitral Award, pursuant to Sections 9 and 13 of the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 9, 13, as follows:

**NATURE OF THE ACTION**

1. This action arises out of an arbitration proceeding initiated by Plaintiff on May 24, 2024 pursuant to a Demand for Arbitration. Plaintiff was granted leave to file an Amended Demand on August 26, 2024.

2. On February 5, 2025, the Arbitration Panel issued a Final Arbitration Award.

**PARTIES**

3. Plaintiff is an Illinois Limited Liability Company with its principal place(s) of business located in Morris, Grundy County, Illinois and in Bartlett, Kane County, Illinois.

4.     Defendant, Heidelberg, formerly known as Hanson Aggregates Midwest, Inc. is a Kentucky Corporation, who is qualified to transact business in the State of Illinois and who owns and operates numerous quarries or mines or other aggregate facilities throughout northern Illinois.

## JURISDICTION, VENUE, AND APPLICABLE LAW

5.     This Court has personal jurisdiction over Plaintiff and Defendant because they each transact business in the State of Illinois.

6.     This Court has subject matter jurisdiction under diversity of citizenship as the parties are citizens of different states and the amount in controversy exceeded $75,000.  See, 28 U.S.C § 1332(a) and Joint Status Report Regarding Jurisdiction (filed November 27, 2023, Docket No. 33).

7.     Venue in this Court is proper because the Arbitration was conducted in and the Final Arbitration Award was issued in Chicago, Illinois.

## FACTUAL BACKGROUND

8.     On March 23, 2023, Patterson filed a lawsuit against Heidelberg in the Twelfth Judicial Circuit Court, Will County, Illinois.  (hereinafter "Complaint").

9.     Heidelberg removed Patterson's Complaint to the U.S. District Court for the Northern District of Illinois and moved to dismiss the case or in the alternative to compel arbitration. The Court granted Heidelberg's motion to compel arbitration,  directing that the claims in the Complaint be submitted to arbitration and stayed the litigation pending resolution of the arbitration. *See*, Memorandum Opinion Order, dated March 27, 2024, Docket No. 39).

10.     Plaintiff submitted its Demand For Arbitration with the American Arbitration Association on May 24, 2024, in accordance with the arbitration clause contained within Sales Agreement and incorporated into the Marketing Agreement. *See* Ex. A § 14(c) (Sales Agreement arbitration clause); Ex. B § 6 (Supply Agreement provision incorporating Sales Agreement

2

arbitration clause). The arbitration clause provides that any judgment on the award rendered in arbitration may be entered in any court having jurisdiction. *Id.*

11.     The Arbitration Panel granted Plaintiff leave to amend its Demand for Arbitration on August 26, 2024.

12.     The AAA confirmed the appointment of three arbitrators for this arbitration proceeding. *See* Ex. C (appointment of arbitrators).

13.     Thereafter, scheduling conferences were held, with scheduling dates and hearing dates adjusted and readjusted to accommodate the parties, their counsel, and the arbitrators. The parties conducted substantial discovery, including document exchanges and interrogatories. Motions concerning objections to document requests and interrogatories, and to privileges asserted were briefed and decided. The parties submitted extensive pre-hearing briefs accompanied by exhibits and authorities. Hearing exhibits were pre-marked and exchanged, along with witness lists, before the in-person Hearing on the Merits.

14.     A full-day Hearing was held in Chicago on November 25, 2024. Matthew Vondra (Vice President of Southwind Industries, holding company for Patterson), John Harris (President of Southwind Industries, holding company for Patterson), and James Bottom (Vice President and General Manager of Heidelberg Illinois business unit) testified in-person. Cindy Swankoski (Heidelberg Business Analyst) testified remotely. All were subject to direct and cross-examination, as well as questions from the arbitrators. All exhibits offered were admitted without objection. The proceedings were transcribed by a court reporter.

15.     On December 3, 2023, the Panel requested the parties provide written responses to specific questions. The Panel extended the time for the parties to provide such responses until the completion of the transcript of proceedings from November 25, 2025 and such responses were provided on December 13, 2025.

16.     On February 5, 2025, the Panel entered a Final Arbitration Award (the "Award"). The Award is attached as Exhibit D.

17.     The Award provides as follows:

   a.   Patterson's prayer for contract damages against Heidelberg is granted. The Arbitrators ordered Heidelberg to pay Patterson $110,270.16 in damages plus late payment interest at the rate of 3% per annum until paid. For the 18-month period April 2023 through December 2024, interest owed is $4,962.15.

   b.   Patterson's request for a declaration that its 2016 Aggregate Sales and 2016 Marketing Agreement and Aggregate Supply Agreement are terminated is denied.

   c.   Each side shall bear its own attorney's fees.

   d.   The administrative fees and expenses of the American Arbitration Association totaling $8,250.00 and the compensation and expenses of the arbitrators totaling $101,590.00 shall be borne by Respondent Heidelberg. Therefore, Heidelberg shall reimburse Claimant Patterson the sum of $59,045.01 representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Patterson in the arbitration.

   e.   The Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted in the Award are thereby denied.

18.     The Final Award provides that the damages due to Patterson based on Heielberg's breach of contract accrues interest at a 3% per annum rate until paid by Heidelberg so that the amount of interest due January 1, 2025 through March 31, 2025 is $5,789.28, with interest accruing until paid.

**CONFIRMATION OF ARBITRAL AWARD AND ENTRY OF JUDGMENT**

4

19. The Federal Arbitration Act ("FAA") states, in relevant part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9.

20. This case meets all the requirements for confirmation of the Award and entry of a judgment.

21. First, Section 14(c) of the Marketing Agreement, incorporated under Section 6 of the Supply Agreement, satisfies the first requirement of the FAA because it authorizes enforcement of the Award in any court having jurisdiction.

22. Second, the Parties make this application within one year after delivery of the Award. The Award is dated February 5, 2025, so the deadline by which Plaintiff may bring this Petition runs through February 5, 2026. Moreover, this Court has jurisdiction to enter this because the Award was made in Chicago, Illinois.

23. Third, the Parties agree to confirm the Award and enter judgment on the Award. Neither Party is seeking to modify, correct or vacate the Award.

24. Accordingly, the Award should be confirmed and judgment should be entered on the Award.

**WHEREFORE**, the Parties request the entry of an order confirming the February 5, 2025 Final Arbitration Award, entering judgment on said award and granting any further relief that this Court deems just and appropriate.

Respectfully submitted,

Dated: March 28, 2025

**HEIDELBERG MATERIALS MIDWEST AGG, INC. f/k/a HANSON AGGREGATES MIDWEST, INC.**

By: */s/ Paul W. Carroll*

One of its attorneys

Paul W. Carroll
(pcarroll@gouldratner.com)
Alison Constantine
(aconstantine@gouldratner.com)
Gould & Ratner LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601
Telephone: (312) 236-3003

**PATTERSON 357, LLC**

By: */s/ Lisa H. Quinlan*

One of their Attorneys

William J. Quinlan
Lisa H. Quinlan
THE QUINLAN LAW FIRM, LLC
233 South Wacker Drive Suite 6142
Chicago, Illinois 60606
Telephone: (312) 883-5500
Fax: (312) 971-1070
wjq@quinlanfirm.com
lquinlan@quinlanfirm.com
docketing@quinlanfirm.com

**Exhibit A**

## AGGREGATE MARKETING AND SALES AGREEMENT

THIS AGGREGATE MARKETING AND SALES AGREEMENT (the "**Agreement**") is made and entered into as of this _1st_ day of _February_____, 2016, by and between **MATERIAL SERVICE CORPORATION**, a Delaware corporation ("**MSC**") and **PATTERSON 357, LLC.**, an Illinois limited liability company ("**Patterson**"), each hereinafter referred to as "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, Patterson currently operates an underground limestone mine and aggregate crushing plant (the "**Mining Operations**") in Joliet, IL (the "**Property**") pursuant to a Master Lease Agreement with Keating Stone of Illinois, LLC, Creek Partners, LLC and RG Stone, LLC, collectively the owners of the Property which is more particularly described on Schedule 1; and

WHEREAS, in connection with the Mining Operations, Patterson has obtained all federal, state, county and local permits, licenses and approvals necessary to conduct the Mining Operations; and

WHEREAS, MSC desires to obtain and Patterson desires to grant to MSC the exclusive right to market and sell the aggregate materials mined and crushed by Patterson from the Property.

NOW, THEREFORE, for and in consideration of the covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do agree and intend to be legally bound as follows:

1. Term and Renewals; Termination Fee; Election to Operate.

(a) Subject to the other provisions herein contained, this Agreement shall commence on January 1, 2016 (the "**Commencement Date**"), and continue for an initial term of seven (7) years following the Commencement Date, until December 31, 2022. This Agreement may be extended by MSC, at its option, for seven (7) consecutive additional seven (7) year periods. Notice of the exercise of any option to extend shall be provided no later than fourteen (14) months prior to the then applicable expiration of the term of this Agreement. The original term of this Agreement and any permitted extension thereof shall be referred to as the "**Term**".

(b) MSC may terminate this Agreement for any reason upon giving Patterson two (2) years advance written notice thereof, provided however, such termination may not occur if: (1) MSC is in default at the time of notice of termination; or (2) prior to January 1, 2021. If MSC terminates this Agreement pursuant to this Section 1(b), provided no Default has occurred with respect to Patterson under this Agreement, on or before the expiration date of the initial Term or of the first renewal term, as applicable, then MSC's sole and exclusive liability and Patterson's sole and exclusive remedy for a termination pursuant to this Section 1(b) is MSC's payment to Patterson of the sum of $500,000.00 as a termination fee within thirty (30) days of the termination. No termination or other fee shall be due for MSC's decision to decline to exercise any option to extend this Agreement.

HEIDELBERG00112

(c) At the time of notification of exercise of any option to extend, MSC may also elect in writing to assume responsibility for the Mining Operation for the duration of the next extension period. Upon notification of the election to assume responsibility for the Mining Operation, the Parties will negotiate an agreement for the transfer of responsibility, including the assignment of all rights and permits necessary for MSC to conduct Mining Operations, the assumption by MSC of liability associated with the Mining Operations, and modifications to any and all financial terms of this Agreement impacted by the assumption of responsibility of Mining Operations by MSC. If an agreement for the transfer of responsibility cannot be completed by the Parties within six (6) months of any notification of election to assume such responsibility, then MSC may elect in writing either to continue with its exercise of an option to extend or to revoke its exercise of said option without penalty, other than payment of the termination fee described in Section 1(b), if applicable.

2.      Grant of Right. Patterson hereby grants to MSC the exclusive right, during the Term and any renewal thereof, to market, sell and offer for sale aggregates mined and processed at the Property.

3.      Production and Processing of Aggregates; Type, Gradation and Schedule of Aggregate Production; Quality Control.

(a) During the Term and any renewal thereof, Patterson shall produce and process at the Property aggregate material for marketing and sale by MSC and in accordance with Aggregate specifications provided by MSC (collectively the "**Aggregates**").

(b) No later than February 1 of each calendar year, representatives of Patterson and MSC shall meet to determine the types, gradations, amounts, and production schedule of the Aggregates (the "**Aggregate Matrix**") to be processed by Patterson at the Property. All decisions with regard to the Aggregate Matrix shall be made by and between the Parties' representatives no later than February 15th. Thereafter, any changes or modifications to the Aggregate Matrix shall be determined by the Operating Committee pursuant to Section 13; provided that, in no event, shall MSC increase its Aggregate Matrix by more than One Hundred Thousand (100,000) tons per remaining month in any calendar year.

(c) Any issues or disputes relating to the conformance of Aggregates with the required specifications shall discussed by and between the representatives of the Operating Committee at its quarterly meetings as provided in Section 13 or sooner if requested in writing by one of the representatives; provided, however, that the decisions of the Operating Committee shall not abrogate or diminish Patterson's responsibility for Aggregate quality control and conformance with applicable specifications as hereinafter defined.

(d) For reasons not attributable to a Force Majeure Event, if Patterson fails to supply the amount or type of Aggregates agreed upon by the Parties in the Aggregate Matrix established pursuant to Section 3(b) in any given year, then the aggregate of the Base Fee and Royalty will be reduced by $1 for each ton shortfall for each type of Aggregate for such year, not to exceed $3,000,000 in any such year.

4.      Base Fee; Processed Material Fee; Royalty.

HEIDELBERG00113

(a) <u>Base Fee</u>. During the initial seven (7) year Term of this Agreement, and as compensation for the exclusive right to market and sell aggregates from the Property, MSC shall pay an annual base fee (the "**Initial Base Fee**") to Patterson of One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00). The **Initial Base Fee** shall be paid in twelve (12) monthly installments. All payments shall be made in advance not later than the first (1st) day of each calendar month. The Initial Base Fee is in addition to any royalty payments owed by MSC to Patterson pursuant to the royalty provision(s) contained herein.

The Initial Base Fee shall be adjusted as of January 1st of each year following the seventh (7th) year of this Agreement for inflation or deflation by multiplying the Initial Base Fee, as cumulatively adjusted as of the last Adjustment Date ("**Adjusted Base Fee**"), by an amount equal to the lesser of 1.025 or the Inflation Factor. The "**Inflation Factor**" shall be determined by dividing the "Producer Price Index for Construction Sand/Gravel/Crushed Stone (Code 1321)", as published by the U.S. Department of Labor, Bureau of Labor Statistics (the "**PPI**") for the immediately preceding twelve (12) month period ending with the Adjustment Date by the PPI for the twelve (12) month period ending on the date that is one year prior to the Adjustment Date. Therefore, in the eighth (8th) year of the Agreement, the Inflation Factor shall be determined by dividing the PPI in effect as of the end of the seventh (7th) year of the Agreement by the PPI in effect as of the end of the sixth (6th) year of the Agreement. This adjustment shall be made as soon as practicable but no later than thirty (30) days after the PPI is available for the immediately preceding twelve (12) month period ending with the Adjustment Date, and the adjustment shall be applied retroactively to the first month of the applicable year of the Agreement, with any overpayments or underpayments being paid or reimbursed, as applicable, with the next payment of the Base Fee. Notwithstanding the foregoing, if the Inflation Factor is more than 1.025 on any Adjustment Date, the Base Fee shall only be increased by multiplying the Adjusted Base Fee for the preceding year by 1.025 on the Adjustment Date (the "**Cap**"); provided, however, that if the amount of the Inflation Factor exceeds the Cap on any Adjustment Date, then the amount of the excess shall be carried forward to the immediately succeeding Adjustment Date only if the Inflation Factor is less than 1.025% on the immediately subsequent Adjustment Date, and only in such case, the Base Fee may be increased to reflect the amount so carried over from the immediately preceding Adjustment Date (except that in no event shall the Adjusted Base Fee on any Adjustment Date be increased/decreased by more than 2.5%).

(b) <u>Processed Material Fee; Storage of Material</u>.

(i). In addition to the Initial Base Fee or Adjusted Base Fee (as applicable), during the Term MSC shall pay to Patterson a fee of $7.00 for each ton of material processed by Patterson in accordance with MSC's Aggregate Matrix ("**Processed Material Fee**"), including screenings or other processing byproducts identified and quantified in the Aggregate Matrix. The Processed Material Fee shall be paid by MSC to Patterson on a monthly basis as Aggregates are sold by MSC from the Property. Any Processed Material Fee due shall be paid by MSC to Patterson not later than the fifteenth (15th) day of each calendar month for Aggregates sold in the preceding calendar month. If MSC fails to sell all of the processed material of a particular type or gradation ("Unsold Aggregates") in accordance with the Aggregate Matrix agreed upon by the Parties pursuant to Section 3(b), then MSC shall pay Patterson the Processed Material Fee for the Unsold Aggregates at the

HEIDELBERG00114

end of each calendar year, rather than when such Aggregates are eventually sold by MSC ("**Advanced Processed Material Fee**"), and, MSC shall not pay a Processed Material Fee for Unsold Aggregates sold in the subsequent year until it sells an amount of the Unsold Aggregates equal to the quantity of unsold material in the previous year for which the Advanced Processed Material Fee was paid. The Processed Material Fee is comprised of two (2) components: material production costs representing $5.50 ("Material Production Fee"); and overhead costs representing $1.50 ("Overhead Fee"). The Material Production Fee will increase annually, beginning on January 1, 2017, by the lesser of: (A) 3.0%; or (B) the actual annual increases in processing costs incurred either directly by Patterson as the Aggregate crusher or as a result of an increase in costs pursuant to a subcontract for crushing services with a third party. The Overhead Fee will increase annually, beginning on January 1, 2017, by the lesser of: (A) 2.75%; or (B) the actual annual increases in overhead costs incurred either directly by Patterson or as a result of an increase in costs associated with services provided by a third party. The Processed Material Fee shall be full compensation of Patterson for all costs it incurs under this Agreement, including, but not limited to: materials mining; materials crushing; general overhead including utilities; real estate taxes, load out of material for transportation by vehicle; load out of material onto the conveyor system described herein; applicable barge easement access fees; and barge and truck loading. The Processed Material Fee shall not include "surcharge" pricing for any material production or processing beyond standard work hours (i.e., 2nd shift or weekend production). Beginning in 2016, if MSC requests truck and/or barge loading on Sundays or holidays Patterson will charge an hourly fee of $350 in the aggregate for such work, with a minimum of eight (8) hours of work for each request. Beginning in 2017, and prior to February 1 of each subsequent year of the Term, the Operating Committee shall agree upon the hourly rate for Sunday and Holiday load out.

(ii). By December 31 of each year, MSC shall notify Patterson of MSC's decision to not sell certain quantities and/or types of Aggregates produced by Patterson pursuant to the Aggregate Matrix (**"Rejected Aggregates"**). MSC shall pay Patterson a fee of $1.50 per ton of Rejected Aggregates ("Rejected Aggregates Fee") to satisfy MSC's obligation to sell said Aggregates under this Agreement. The Rejected Aggregates Fee will increase annually, beginning on January 1, 2017 by the lesser of: (A) 3.0%; or (B) the actual increases in storage and/or disposal costs incurred either directly by Patterson or as a result of an increase associated with services provided by a third party. For the avoidance of doubt: (A) MSC is obligated to pay the Processed Material Fee for the Rejected Aggregates; and (B) MSC will not take ownership of the rejected Aggregates at any time, and Patterson shall be solely and exclusively responsible to store and/or dispose of said Aggregates.

(c) <u>Royalty</u>. In addition to the Initial Base Fee or Adjusted Base Fee (as applicable) and the Processed Material Fee, during the Term, MSC shall pay to Patterson monthly royalty payments (the "**Royalty**"), which in the aggregate are equal to the greater of (i) the minimum annual royalty for each calendar year of the Agreement as set forth below (the "**Minimum**

HEIDELBERG00115

**Royalty"**) and (ii) the percentage of Net Sales (as defined herein) for the applicable calendar year of the Agreement as set forth below.

| Applicable Calendar Year | Royalty Percentage | Minimum Annual Royalty |
|---|---|---|
| 2016 | 8% | $510,000 |
| 2017 | 8% | $510,000 |
| 2018 | 8% | $510,000 |
| 2019 | 11% | $701,250 |
| 2020 | 11% | $701,250 |
| 2021 | 11% | $701,250 |
| 2022 | 11% | $701,250 |

(i). **"Net Sales"** means the total gross sales, on an accrual basis, of MSC arising from the sale of Aggregates, less discounts, credits, rebates, customer allowances, sales taxes, use taxes, gross receipts taxes, retrieval taxes and municipal fees assessed on the sale of the Aggregates, outbound freight charges, and any other amounts that do not inure to the benefit of MSC.

(ii). Calculation of Royalty Amounts

A. Monthly Payment Amounts. After the end of each calendar month during the Term, and no later than the fifteenth (15th) day of the following calendar month, MSC shall calculate and deliver to Patterson: (i) a written statement (the "**Monthly Statement of Net Sales**") showing Net Sales during the applicable calendar month, as more fully set forth in Section 4.c.ii.D hereof; and (ii) funds in the dollar amount determined by applying the applicable calendar year's royalty percentage, as set forth in Section 4.c above, to the dollar amount of Net Sales for said calendar month.

B. Annual Payment Amounts. At the conclusion of each calendar year of the Term, the Parties shall calculate the aggregate of monthly Royalty paid by MSC to Patterson during such calendar year. During years 1-3 of the original Term, MSC shall pay to Patterson the actual royalty accrued based on the royalty percentages set forth in the table above. If, at the conclusion of year 3, the total actual royalty paid to Patterson is less than One Million Five Hundred Thirty Thousand Dollars and No Cents ($1,530,000.00)("**Initial Three Year Total Minimum Royalty**"), then MSC shall pay the difference between the actual royalty paid and the Initial Three Year Total Minimum Royalty. After year 3, and for each subsequent calendar year of the Term, if the monthly Royalty payments made by MSC for such calendar year are less than

HEIDELBERG0116

the Minimum Royalty set forth in Section 4.c above for said calendar year, then not later than January 31 of the following calendar year, MSC shall pay to Patterson the difference between the applicable Minimum Royalty and the aggregate amount of the monthly Royalty payments actually paid during the preceding calendar year (the "**Shortfall Payment**"). If the monthly Royalty payments made for such calendar year exceed the Minimum Royalty set forth in Section 4.c above for said calendar year, then no additional amounts shall be due.

C.    Credits Related to Supply Agreement. The Minimum Royalty for each calendar year in Section 4.c. above is calculated based upon the assumption that Patterson submits a bona fide offer to purchase at least 500,000 tons of aggregates from MSC and/or its affiliates annually from the Property or other properties owned by MSC or its affiliates, as provided under the Supply Agreement. If Patterson fails to offer to purchase at least 500,000 tons of aggregates as required under the Supply Agreement for reasons that are unrelated to availability of aggregates, and MSC has not exercised its option to extend the time frame for the offer to purchase of said aggregates based on reasonable justification, then MSC shall receive a credit against Royalty due. The amount of the credit (the "**Supply Agreement Credit**") shall be determined as follows: (i) 500,000 tons, minus any tons not offered to purchase related to the lack of availability of aggregates, minus the actual number of tons offered to purchase during such calendar year under the Supply Agreement, multiplied by (ii) $8.50 per ton, and multiplied by (iii) the Royalty Percentage applicable to the calendar year. The Supply Agreement Credit shall be applied as directed by MSC to payments of Royalty due in the calendar year and may be used as an offset against either monthly payments under Section 4.c.ii.A above, or annual payments under Section 4.c.ii.B above until the Royalty Credit is fully applied for the benefit of MSC.

D.    During the Term of the Agreement, MSC shall keep accurate and complete records of its Net Sales during each month of the Term, and shall permit Patterson, or its agents, to inspect and copy such records at MSC's offices during normal business hours. MSC shall furnish Patterson with monthly reports, as set forth in Section 4.c.ii.A hereof, showing the number of tons of the Aggregates sold from the Property. MSC may, in its sole discretion, elect to provide Patterson with reports showing only the results on a compilation basis (*i.e.*, average sales price) and if Patterson desires underlying information, MSC shall, at Patterson's expense, provide such information to an independent third party acceptable to the Parties who will keep such information confidential but shall otherwise certify MSC's reports. Patterson or a certified public accountant engaged by Patterson shall have the right, at Patterson's sole cost and expense, to examine and audit, during normal business hours, MSC's books and records with respect to the information described in this Section 4.c.ii.D and subject to the limitations in this Section 4.c.ii.D for any calendar month during the Term, upon reasonable prior notice to MSC. Any Monthly Statement of Net Sales shall be deemed final and accepted by Patterson, unless Patterson shall deliver written notice to MSC of any specific exceptions to any enumerated item within ninety (90) days after the date of the applicable Monthly Statement of Net Sales. If Patterson delivers such written exception to MSC within such ninety (90) day period, and if such dispute is not resolved by agreement within thirty (30) days after delivery of Patterson's exception notice, it shall be settled by submission of the dispute to an independent auditor acceptable to MSC and Patterson for a final and binding determination at Patterson's sole cost and expense; provided, however, that, if such independent auditor determines that the Net Sales as set forth in the applicable Monthly Statement of Net Sales is understated for any such calendar

HEIDELBERG00117

month, then MSC shall immediately pay Patterson any such understated Royalty; and, <u>provided further</u>, if the actual Royalty is understated by five percent (5%) or more, then the cost of such determination by the independent auditor shall be at MSC's sole cost and expense, and MSC shall reimburse Patterson for the total costs of the certified public accountant and the independent audit.

(e) <u>Late Payments</u>. If MSC becomes in Default for failure to pay any payment of the Initial Base Fee or Adjusted Base Fee (as applicable), the Processed Material Fee, or the Royalty when due hereunder, then MSC shall also pay to Patterson, not as a penalty but as a late payment charge, a sum equal to one percent (1%) of the amount due. Any payment of the Base Fee or Processed Material Fee, the Royalty or other amounts to be paid hereunder, that is unpaid after the applicable due date and remains unpaid thirty (30) business days after written notice from Patterson that the amount is due and unpaid, shall also bear interest at the rate of 3% per annum from the date when the same was due and payable under the terms of this Agreement until the same be paid.

(f) <u>Refusal to Sell</u>. For the avoidance of doubt, a refusal by MSC to accept any offer to purchase Aggregates will not be considered the sale of Aggregates for purposes of this <u>Section 4</u>.

**5.** <u>Not Used</u>.

**6.** <u>Conveyor System and Facilities</u>.

(a) On or before April 15, 2016 (the "**Conveyor System Completion Date**"), Patterson, at Patterson's sole cost and expense, shall install or cause to be installed a reversible conveyor system (the "**Conveyor System**") on the Property connecting the Property to the barge loading area for the exclusive use of MSC during the Term (the "**Conveyor System Work**"). Patterson shall ensure for the entirety of the Term that the Conveyor System is fully operational and able to deliver products from the Mining Operation to barges docked in the Barge Easement area. If Patterson fails to complete the Conveyor System Work on or before the Conveyor System Completion Date, then it shall propose an alternative method of transporting material that is acceptable to MSC in its sole and absolute discretion. In the event no such alternative method is accepted by MSC, then until the Conveyor System Work is complete and operational, Patterson shall be responsible for all incremental costs associated with transporting Aggregates to the barges from the Mining Operation. Incremental costs shall include any increase in transportation cost in getting Aggregates to the barges as compared to the costs associated with the use of the Conveyor System. All incremental costs incurred by MSC under this <u>Section 6(a)</u> shall be invoiced to Patterson on a monthly basis and reimbursed by Patterson within fifteen (15) days of receipt of said invoice. Any dispute regarding claimed incremental costs shall be referred to the Operating Committee for resolution. If, after two (2) business days, the Operating Committee cannot resolve the dispute, the terms of <u>Section 14</u> below shall apply.

(b) <u>Improvements Reimbursements; Barge Easement Fee</u>.

(i) As full reimbursement for the costs associated with the Conveyor System Work, MSC shall pay to Patterson $0.25 for each ton of Aggregates conveyed by the Conveyor System or otherwise loaded onto a barge for transport (the

HEIDELBERG00118

"**Conveying Fee**"). The Conveying Fee is due on the first day of each calendar month of the Term, as the same may be extended, through and including the expiration of the second renewal term (*i.e.*, December 31, 2029). The aggregate amount of monthly Conveying Fees due hereunder shall not to exceed the lesser of: (A) $2,300,000 or (B) Patterson's actual costs incurred to install the Conveyor System (the "**Conveyor Work Cap**"). The Conveying Fee will increase each calendar year by the same percentage as the increase in the Overhead Fee as provided for in subsection 4(b)(i). Patterson shall be responsible for all costs of the Conveyor System Work in excess of the Conveyor System Cap and the maintenance of the Conveyer System. Patterson shall keep accurate and complete records of its costs incurred to install the Conveyor System Work and its costs to process the Aggregates, and Patterson shall make those records available to MSC upon request to allow MSC to calculate and verify the amounts set forth in subsections 4(b)(i), 6(b)(i)(B), and 6(b)(i)(Z).

(ii) Beginning in 2016, and as full reimbursement for the costs associated with the Barge Easement Agreement between Patterson and ARC Terminal for use of the barge dock upon which the Conveyor System will run, MSC shall pay to Patterson $0.25 for each ton of Aggregates conveyed by the Conveyor System or otherwise loaded onto a barge for transport ("Barge Easement Fee"). The Barge Easement Fee shall increase, annually, by the lesser of: (A) 2.0%; or (B) the actual increase, if any, pursuant to the Barge Terminal Easement Agreement between Patterson and ARC Terminal or any subsequent party in interest. The Barge Easement Fee shall be due on the first day of each calendar month of the Term, as the same may be extended.

(c) <u>Facilities</u>. During the Term, Patterson, at Patterson's sole cost and expense, shall provide to MSC, for MSC's operation and control, an office, scale system, and other necessary equipment and facilities at the Property for MSC's use in carrying out its sales and marketing activities.

7. <u>Force Majeure Event</u>.

(a) <u>General Definition</u>. As used in this Agreement, a "**Force Majeure Event**" means any act or event, whether foreseen or unforeseen, that is set forth in <u>Section 7(b)</u> below and meets all three of the following tests:

(i) the act or event prevents: (A) Patterson, in whole or in part, from materially performing for more than two (2) consecutive months its obligations under this Agreement which have not been waived by MSC; or (B) Patterson, in whole or in part, from satisfying any conditions to MSC's obligations under this Agreement which have not been waived by MSC; and (C) MSC from performing its obligations under this Agreement which have not been waived by Patterson; and

(ii) the act or event is beyond the reasonable control of and not the fault of the affected Party claiming Force Majeure, its subcontractors and any third party contractors; and

HEIDELBERG00119

(iii)    the affected Party claiming Force Majeure has been unable to avoid or overcome the act or event by the exercise of commercially reasonable due diligence and effort.

(b) <u>Acts and Events Included in the Definition of Force Majeure Event</u>. Each of the following acts and events is deemed, subject to and only to the extent in compliance with the requirements of <u>Section 7(a)</u> of this Agreement, to be a Force Majeure Event: war, flood, lightning, earthquake, fire, volcanic eruption, landslide, hurricane, cyclone, typhoon, tornado, explosion, civil disturbance, act of God, terrorist act, military action, governmental restriction or local or regional labor strike (except if such strike involves the employees of the Party claiming Force Majeure).

(c) <u>Base Fee Reduction</u>. Subject to the provisions of <u>Sections 7(e), (f), (g), and (h)</u> of this Agreement, if, as a direct result of a Force Majeure Event, Patterson is materially prevented from conducting mining operations at the Property, and such operations are materially disrupted to the extent that MSC is unable to sell the Aggregates for more than two (2) months, MSC's obligation to pay the Initial Base Fee or Adjusted Base Fee (as applicable), the Processed Material Fee, and the Royalty shall be reduced by one hundred percent (100%) for the entire period of the Force Majeure Event.

(d) <u>Written Reports</u>.  No later than five (5) business days after becoming aware of the occurrence of a Force Majeure Event, the Party claiming Force Majeure shall furnish the other Party with a written report describing the particulars of the occurrence, including an estimate of its expected duration and probable impact on the performance of the claiming Party's obligations under this Agreement.  During the continuation of the Force Majeure Event, the Party claiming Force Majeure shall furnish timely, regular written reports, updating the information required by this <u>Section 7(d)</u> and providing any other information that the other Party reasonably requests.

(e) <u>Other Obligations</u>.  During the continuation of the Force Majeure Event, the Party claiming Force Majeure shall:  (i) exercise commercially reasonable efforts to mitigate or limit damages of the other Party; (ii) exercise commercially reasonable efforts to overcome the Force Majeure Event; and (iii) to the extent it is able, continue to perform its obligations under this Agreement other than those that are specifically suspended due to the Force Majeure Event. Notwithstanding anything set forth herein, neither Party is required to settle any strike, work-to-rule action, go-slow or similar labor difficulty on terms it considers unfavorable in order to meet the requirement that it exercise commercially reasonable due diligence to avoid or overcome the Force Majeure Event.

(f) <u>Resumption of Performance</u>.  When the Party claiming Force Majeure is able to resume performance of its obligations under this Agreement, it shall immediately give the other Party written notice.  Such notice shall state that the Party claiming Force Majeure shall resume performance under this Agreement no later than five (5) business days after the notice is delivered.

(g) <u>Disputes</u>.  The Operating Committee Representatives shall attempt in good faith to resolve any dispute between the Parties as to whether a Force Majeure Event has occurred, or and any other matter under this Agreement related to a Force Majeure Event.

(h) <u>Termination</u>. If a Force Majeure event continues for a period of more than six (6) consecutive months, either Party is entitled to terminate this Agreement by giving a notice to the other Party pursuant to <u>Section 10</u> hereof, with the termination to be effective on the date which is forty five (45) days following the date of the termination notice.

(i) <u>Exclusive Remedy</u>. The relief offered by this force majeure provision is the exclusive remedy available to the parties with respect to a Force Majeure Event, and the parties waive any other protections that may be provided by Law, as well as the common law defenses of impossibility and impracticability with respect to the Force Majeure Events and any event or act that might be deemed a force majeure event under the common law.

8. <u>Indemnity</u>. Each Party shall indemnify, defend (by legal counsel reasonably approved by the other) and hold the other Party harmless from and against any and all claims, liability, damages (excluding, however, consequential damages), cost and expense (including the cost of investigation, litigation, and reasonable attorneys' fees) incident to, arising out of, or in any way related, directly or indirectly, including but not limited to the damage to or destruction of third-party (Affiliates are not third parties) property or injury to or death of any person whomsoever (excluding employees of the other Party) that is caused by or arises out of (i) the acts or omissions of such indemnifying Party in its activities on the Property, during the Term or (ii) the breach of any representation or warranty made by such Party contained therein. This <u>Section 8</u> shall survive the expiration or termination of this Agreement.

9. <u>Not Used</u>.

10. <u>Notices</u>. Except as otherwise provided, all notices authorized or required under this Agreement shall be in writing and shall be considered given only when delivered in person or one (1) business day after being sent by overnight courier with a nationally recognized overnight courier, to Patterson or to MSC at their respective addresses as set forth below (or at such other address as may hereafter be designated in writing by a notice given pursuant to this <u>Section 10</u>):

Patterson:

      Patterson 357, LLC
      Jacob Mrugacz
      2250 Southwind Blvd.
      Bartlett, IL 60103

With a copy to:

      George D. Maurides, Esq.
      Maurides & Foley, L.L.C..
      2 North LaSalle Street
      Suite 1900
      Chicago, Illinois 60602

HEIDELBERG00121

MSC:

> Christoph Streicher
> c/o Lehigh Hanson, Inc.
> 7660 Imperial Way
> Allentown, PA 18195

**11.** <u>Patterson Representations and Warranties</u>. As a material inducement to MSC to enter into this Agreement, and intending that MSC rely thereon, Patterson represents and warrants to MSC as follows:

(a) <u>Organization and Authority</u>. Patterson, has been duly organized, is validly existing, and is in good standing as a limited liability company, in the state of Illinois. Patterson has the full right and authority and has obtained any and all consents required, to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Patterson will be, authorized and properly executed and constituted, or will constitute, as appropriate, the valid and binding obligation of Patterson, enforceable in accordance with their terms.

(b) <u>Conflicts and Pending Actions or Proceedings</u>. There is no agreement to which Patterson is a party or, to Patterson's knowledge, binding on Patterson which is in conflict with this Agreement. There is no action, lawsuit, governmental investigation or other proceeding pending or, to the knowledge of Patterson, threatened against Patterson or in any way relating to the Property, including, without limitation, any condemnation proceeding or any proceeding or investigation under applicable Environmental Laws.

(c) <u>Notice of Violations or Defects</u>. Patterson has not received any written notice, and Patterson has no other knowledge, that the Property or the use thereof violates any Laws, including, without limitation, Environmental Laws, or any covenants or restrictions encumbering the Property; of any material physical defect in the Property.

(d) <u>Anti-Money Laundering Laws</u>. Patterson is/has not: (i) under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined in this paragraph); (ii) been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Agreement, the term "**Anti-Money Laundering Laws**" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a financial institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.

(e)     Conformance With Laws and Contracts.  Patterson currently holds and has paid for, and the Permits and Approval comprise, all permits, approvals, authorizations, licenses and certificates required under any Federal, State or local law, ordinance, rule or regulation or by any governmental or quasi-governmental agency for the Mining Operations at the Premises, and all of the same are in good standing, and no defaults or violations exist under any of the Permits and Approvals.

(f)     Sale of Aggregates by Patterson.  Patterson shall not, either through itself or its Affiliates, sell any aggregates produced by Patterson or its Affiliates at the Property during the Term of this Agreement.

(g)     Capability to Produce and Process Required Aggregates. The Property has been evaluated by expert consultants familiar with underground mine capacity and has been determined to contain material reserves sufficient for Patterson to produce 3,000,000 of Aggregates each year during the Term or any extension thereof. Further, Patterson has the capability to process for sale, in accordance with specifications provided by MSC, 3,000,000 tons of Aggregates from the Property on an annual basis during the Term or any extension thereof.

(h)     Encumbrances on the Aggregates.  MSC will receive good, marketable, and valid title to the Aggregates, free and clear of all encumbrances and liens of any kind.

(i)     Right to Mine.  Patterson has the sole and exclusive right to Mining Operations on the Property.

(j)     Warranty of Aggregates.  The Aggregates produced by Patterson and provided to MSC for marketing and sale will be free from defects and conform fully with specifications applicable to the project(s) for which the Aggregates will be sold.

12.     MSC Representations and Warranties. As a material inducement to Patterson to enter into this Agreement, and intending that Patterson rely thereon, MSC represents and warrants to Patterson as follows:

(a)     Organization and Authority.  MSC, has been duly organized, is validly existing, and is in good standing as a Delaware corporation, in the state of Illinois. MSC has the full right and authority and has obtained any and all consents required, to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by MSC will be, authorized and properly executed and constituted, or will constitute, as appropriate, the valid and binding obligation of MSC, enforceable in accordance with their terms.

(b)     Conflicts and Pending Actions or Proceedings.  There is no agreement to which MSC is a party or, to MSC's knowledge, binding on MSC which is in conflict with this Agreement.

(c)     Anti-Money Laundering Laws. MSC is/has not: (i) under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States

HEIDELBERG00123

would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined in this paragraph); (ii) been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Agreement, the term "**Anti-Money Laundering Laws**" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a financial institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.

13.     Operating Committee. To facilitate the ongoing mining, processing and production issues that may arise during the Term of this Agreement, to coordinate the activities of the Parties in order to maximize efficiencies, and to address other matters and disputes under this Agreement, Patterson and MSC have agreed to form an operating committee (the "**Operating Committee**"), consisting of two (2) individuals (each an "**Operating Committee Representative**"), one appointed by Patterson and one appointed by MSC. The Operating Committee shall meet from time to time, but at least once per calendar quarter, to consider amendments to any agreements between the Parties, to attempt to resolve disputes between the parties, to consider consents or approvals, and to consider other matters which are referred to the Operating Committee under this Agreement. The unanimous decision of the Operating Committee Representatives shall be binding on the Parties. The initial Operating Committee Representative appointed by Patterson shall be Jacob Mrugacz and the initial Operating Committee Representative appointed by MSC shall be Christoph Streicher. Either Party may change its Operating Committee Representative by written notice to the other party given pursuant to Section 10 of this Agreement. If any matter is reviewed by the Operating Committee and either Operating Committee Representative concludes that the matter is not capable of resolution by the Operating Committee, then such matter may, by notice to the other Operating Committee Representative, be resolved under the provisions of Section 14.

14.     Dispute Resolution.

(a)     Operating Committee/Senior Executives. Except as otherwise provided in this Section 14, the parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement through the Operating Committee, and if the Operating Committee meets and cannot agree, then promptly by negotiations between the appropriate senior executives of the Parties who have authority to settle the controversy ("**Senior Executives**"). If a controversy or claim should arise, appropriate Senior Executives of each party will meet at least once and will attempt to resolve the matter. The Senior Executives will make every effort to meet as soon as reasonably possible at a mutually agreed upon time and place or as otherwise provided to the schedule below and thereafter as often as they deem reasonably necessary to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within the time periods set forth below for the meetings of the Senior Executives, or if either party will not meet prior to the end of the meeting periods set forth below, either party may refer the dispute to binding arbitration pursuant to Section 14(c) below.

(b)    Meetings of Senior Executives.  The Schedule for the Meetings required above is as follows: First Meeting of Senior Executives: (i) when a dispute is not subject to notice and a cure period, the first meeting of Senior Executives shall be held as soon as possible. Senior Executives shall have thirty days after first meeting to resolve the issue prior to the invocation of Section 14(c) below; (ii) when a dispute involves an alleged monetary dispute for which notice is given, the first meeting of Senior Executives shall occur not later than thirty (30) days after the effective date of any notice given. Senior Executives shall have thirty (30) days after the first meeting to resolve the issue before the invocation of Section 14(c) below; and (iii) when the dispute involves a non-monetary breach for which notice is given, the first meeting of Senior Executives shall occur not later than thirty (30) days after effective date of any notice given. Senior Executives shall have thirty (30) days after the first meeting to resolve the issue before the invocation of Section 14(c) below.

(c)    Arbitration.  If any disagreement arises between the Parties concerning any matters set forth in this Agreement, related to this Agreement, or arising between the Parties as a result of this Agreement (a "**Dispute**"), and the Parties are unable to resolve the Dispute by negotiation pursuant to the provisions of Section14(a) and (b) or through the Operating Committee, then the Dispute may only be settled by mandatory, binding arbitration in accordance with this Section 14(c) (unless otherwise specifically provided in Section 14(d) below), and judgment on the award rendered in such arbitration may be entered in any court having jurisdiction.  Notwithstanding the foregoing provision, however, either Party may seek provisional injunctive or other equitable relief from any court of competent jurisdiction to preserve the Party's rights under Section 19 of this Agreement, pending arbitration, and such court may grant such relief without requiring the Party to post bond or to show that an adequate remedy is unavailable at law.  The procedures for such arbitration are as follows:

(i)    Initiation of Arbitration / Selection of the Arbitrator.

(A)    Arbitration proceedings are initiated when a Party (the "**Initiating Party**") serves a written notice of arbitration on to the American Arbitration Association and the other Party, which notice shall include a description of the Dispute and the name of the arbitrator appointed by the Initiating Party, who shall be independent of the Initiating Party.

(B)    Within ten (10) days after the date that such notice is given, the Party to whom such notice is given (the "**Receiving Party**") shall either agree with the arbitrator appointed by the Initiating Party or shall similarly appoint an arbitrator, who shall be independent of the Receiving Party, by giving like written notice to the Initiating Party.

(C)    If the Receiving Party agrees with the arbitrator appointed by the Initiating Party, then such arbitrator shall act as the sole arbitrator.

HEIDELBERG00125

(D)     If the Receiving Party fails to agree with the arbitrator appointed by the Initiating Party and fails to make an appointment within the ten-day period, then the arbitrator appointed by the Initiating Party shall be empowered to act as the sole arbitrator and to render a binding decision concerning the Dispute.

(E)     If the Parties duly appoint two arbitrators, then the two arbitrators so appointed shall, within ten (10) days after the appointment of the latter of them to be appointed, select a third arbitrator, who shall be independent of both Parties. If the two said arbitrators are unable, within said ten-day period, to agree on the selection of said third arbitrator, then the third arbitrator shall be chosen under American Arbitration Association ("AAA") procedures from its panels of arbitrators with commercial experience in the construction industry. The selection of such third arbitrator pursuant to the procedures of the AAA shall be binding on the Parties. The third arbitrator will serve as Chairperson of the Arbitration Panel.

(ii)     <u>Administrative Matters Concerning the Arbitration</u>.

(A)     The arbitrator(s) selected in accordance with the procedure set forth in <u>Section 14(c)(i)</u> of this Agreement (the "**Arbitrator**") shall set a time for the first hearing of the Dispute, which shall be within sixty (60) days following the date the Arbitrator is finally appointed. The final decision of the Arbitrator shall be rendered in writing to the Parties not later than sixty (60) days after the last hearing date.

(B)     The place of any hearing that is part of the arbitration shall be Chicago, Illinois, or at such other place as agreed to by the Parties.

(C)     The existence of the arbitration proceedings, the evidence presented in any such proceedings, and the decision of the Arbitrator shall be deemed to be confidential information, which the Parties shall keep confidential and refrain from disclosing unless required to do so by court order.

(iii)     <u>Limited Discovery / Responsibilities of the Parties</u>.

(A)     The discovery available to the Parties, unless modified by the Arbitrator, shall be limited to that set forth in this <u>Section 14(c)(iii)</u>. Each Party shall have the right to receive from the other Party answers to up to thirty (30)

HEIDELBERG00126

written interrogatories and thirty (30) requests to produce. Such interrogatories and requests to produce must be submitted at least thirty-five (35) days prior to the time the Arbitrator set for the first hearing. Answers to such interrogatories and requests to produce are due to the Party requesting them at least five (5) days prior to the time the Arbitrator set for the first hearing. The Arbitrator may, but is not required to, construe a Party's failure to provide an answer to an interrogatory or a response to a request to produce by such time as an admission against the interest of such Party with regard to the substance of such interrogatory or request to produce.

(B) The Parties shall use all reasonable efforts to facilitate the arbitration. Without limiting the generality of the foregoing, each Party shall make available to the other Party and to the Arbitrator, as the Arbitrator shall determine to be relevant to the Dispute: (i) for inspection and extraction, all documents, books, and records and (ii) at any hearing, personnel under the Party's control. Each Party shall agree to conduct arbitration hearings to the greatest extent possible on successive, contiguous days.

(C) Nothing in this <u>Section 14</u> shall waive or preclude any objection to production or testimony that is based upon any privilege recognized by the law of the State of Illinois.

(iv) <u>Procedural Rules / Governing Law</u>. Except as specified in this <u>Section 14</u>, the arbitration shall be conducted in accordance with the Expedited Procedures under AAA Rules then prevailing. The Arbitrator shall have no authority to decide any Dispute *ex aequo et bono*, but shall be bound by the terms of this Agreement and shall strictly apply the governing law chosen by the Parties.

(v) <u>Form of Decision</u>. The award shall be in writing, shall be signed by the Arbitrator, and shall include findings of fact and conclusions of law, in addition to the reasoning for the disposition of the Dispute.

(vi) <u>Finality of the Decision</u>. The decision of the Arbitrator shall be final and binding on the Parties and shall be enforceable in any court of competent jurisdiction. The Parties specifically disclaim the applicability of the U.N. Convention on Contracts for the International Sale of Goods.

(vii) <u>Fees and Expenses</u>. Each Party shall bear its own fees and expenses. The fees and expenses of the Arbitrator shall be divided equally between the Parties. Any fees and expenses charged by AAA shall be divided equally between the Parties. Notwithstanding the foregoing, however, the Arbitrator may award costs and attorneys' fees to

the prevailing Party as part of the Arbitrator's award on the merits, if the Arbitrator deems such an award appropriate in light of all of the circumstances.

(viii)   Court Action.  If either Party is forced to resort to an action at law or in equity to enforce or interpret the terms of this Agreement, or to enforce the decision of the Arbitrator, then the Party prevailing shall be reimbursed by the other Party for all reasonable costs, attorneys' fees, and expenses that the Party prevailing made or incurred in enforcing the covenants and agreements of this Agreement or the decision of the Arbitrator.  This award of costs, fees, and expenses is in addition to any other relief to which the Party prevailing is entitled.

15.   Governing Law.  The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provision hereof.  This Agreement shall be governed, interpreted and construed under the laws of the State of Illinois.

16.   Sale of Property; Assignment.

(a)   Sale of Property.  All the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, permitted assigns, heirs, devises, legatees, beneficiaries, executors and administrators. Patterson may not assign this Agreement unless: (i) MSC has provided its prior written consent; or (ii) the assignment is connected with a sale of the Property or any interest therein as specifically set forth below.  Patterson may not sell the Property or any interest therein or portion thereof without first providing MSC a right of first refusal as set forth below. In the event that during the Term, Patterson receives a bona fide third party (an Affiliate of Patterson is not a third party) offer to purchase all or a portion of the Property or any interest therein that Patterson wishes to accept, then Patterson agrees to give MSC written notice of such offer, setting forth the financial conditions and all other relevant terms of said offer ("**Notice**").  Within thirty (30) days after receiving such Notice, MSC shall notify Patterson in writing whether or not it intends to exercise its right of first refusal and purchase the Property or the interests therein which was the subject of the Notice, on the terms set forth in the Notice. If MSC does not elect to exercise its right, then MSC waives its right of first refusal to purchase the subject portion of the Property or interest thereon and Patterson shall be free to sell the Property or interest thereon to the third party, provided, however, said third party agrees to assume Patterson's obligations under this Agreement and Patterson assigns this Agreement to the third party purchaser on the same terms and conditions as set forth in the Notice.  Such sale and assignment must occur within one hundred twenty (120) days after the closing date set forth in the Notice, on the terms set forth in the Notice, or Patterson must comply with the provisions of this subsection again.  Any purported assignment in violation of this clause is null, void, and unenforceable.  Upon any permitted assignment pursuant to (ii) above, MSC may terminate this Agreement upon six months advance written notice.

(b)   Assignment.  MSC may not assign this Agreement without the prior written consent of Patterson, which consent shall not be unreasonably withheld, conditioned or delayed. Any purported assignment in violation of this clause is null, void, and unenforceable.

17.     No Joint Venture; Commissions.  This Agreement is not intended to be and shall not create a partnership or joint venture relationship between the Parties. Each Party shall indemnify and hold the other harmless from any claim for real estate commission or finder's fee, including the cost of defense of such claim, where such claim arises from the written or oral statements of such Party or its agents and such Party shall so indemnify and hold the other harmless from any such claims which arise from the written or oral statements of such Party or its agents.

18.     Confidentiality.  Absent prior written consent of each Party, or as may otherwise be required by law, neither Patterson nor MSC may disclose to any third party (excluding the Parties' attorneys, lenders, accountants and consultants under equal confidentiality restrictions) the amount of the Base Fee, Processed Material Fee or Royalty hereunder nor any other term or condition of this Agreement, except: (i) the identity of the Parties; (ii) the description of the Property; and (iii) the Term of this Agreement.

19.     Default.

        (a)     It shall be a "**Default**" or "**Event of Default**" as to MSC under this Agreement if:

                (i)     MSC fails to pay any Initial Base Fee, Adjusted Base Fee, Processed Material Fee or Royalty, or any installment thereof or any other sum required to be paid by MSC under this Agreement when due hereunder and such failure remains uncured thirty (30) business days after MSC's receipt of written notice from Patterson that the amount is due and unpaid;

                (ii)     MSC fails to observe or perform any of the covenants, conditions or obligations herein not relating to any of the those set forth above in subsection (i), that MSC is required to observe or perform under this Agreement, and such failure continues for more than thirty (30) days after notice thereof to MSC; provided, however, Patterson shall not be entitled to exercise its remedies on account of any failures described in this clause if:

                        (A)     such failure cannot reasonably be cured within thirty (30) days,

                        (B)     MSC commences to cure such failure within said thirty (30) day period and thereafter diligently and continuously proceeds with such cure, and

                        (C)     MSC cures such failure within a reasonable period of time not to exceed one hundred eighty (180) days after Patterson's  notice of such failure subject to extension for any Force Majeure Event;

                (iii)     an Event of Bankruptcy (as defined in Exhibit A) as to MSC occurs;

                (iv)     MSC dissolves or ceases to exist and is not reconstituted within thirty (30) days after notice; or

(v)     MSC shall assign this Agreement without the prior written consent of Patterson where such consent is required.

(b)     It shall be a "**Default**" or "**Event of Default**" as to Patterson under this Agreement if:

(i)     Patterson fails to observe or perform any of the covenants, conditions or obligations herein that Patterson is required to observe or perform under this Agreement, and such failure continues for more than thirty (30) days after notice thereof to Patterson; provided, however, MSC shall not be entitled to exercise its remedies on account of any failure described in this clause if:

(A)     such failure cannot reasonably be cured within thirty (30) days,

(B)     Patterson commences to cure such failure within said thirty (30) day period and thereafter diligently and continuously proceeds with such cure, and

(C)     Patterson cures such failure within a reasonable period of time not to exceed one hundred eighty (180) days after Patterson's notice of such failure subject to extension for any Force Majeure Event;

(ii)     Patterson or any Affiliate is in default under any Ancillary Agreement (as defined in Exhibit A) beyond any applicable notice and cure period;

(iii)     An Event of Bankruptcy as to Patterson occurs;

(iv)     Patterson is in default under the Supply Agreement beyond any applicable notice and cure period;

(v)     an Event of Bankruptcy as to MSC occurs;

(vi)     Patterson dissolves or ceases to exist and is not reconstituted within thirty (30) days after notice;

(vii)     Patterson assigns this Agreement without the prior written consent of MSC where such consent is required; or

(viii)     any representation or warranty contained herein by Patterson is or becomes incorrect in any material respect, and Patterson fails to remedy such breach of the representation and warranty to MSC's reasonable satisfaction, within thirty (30) days following Patterson's receipt of notice of the breach.

**20.     Patterson Remedies.** Upon a Default or Event of Default by MSC which under this Agreement remains uncured beyond any applicable notice and cure period, Patterson at its option may, without any further notice or demand of any kind to MSC or other person, exercise

any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity: (a) Patterson may terminate this Agreement and the Term created hereby; and (b) Patterson may additionally (i) seek any declaratory, injunctive or other equitable relief, or restrain or enjoin a violation or breach of any provision hereof, and (ii) sue MSC for and collect any unpaid Base Fee, Processed Material Fee and/or Royalty, which have accrued.

21.    MSC Remedies.    Upon a Default or Event of Default by Patterson under this Agreement, MSC, at its option may, without any further notice or demand of any kind to Patterson or other person, exercise any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity: (a) MSC may terminate this Agreement and the Term created thereby; and (b) MSC may additionally seek any declaratory, injunctive or other equitable relief, or restrain or enjoin a violation or breach of any provision hereof.

22.    Entire Agreement.    This Agreement and each of the Ancillary Agreements, represent the complete understanding between the parties hereto and supersedes all prior negotiations, representations or agreements, whether written or oral, as to the matters described herein. This Agreement may be amended only by written instrument signed by both parties. No requirements, obligations, remedy or provision of this Agreement shall be deemed to have been waived, unless so waived expressly to writing, and any such waiver of any such provision shall not be considered a waiver of any right to enforce such provision thereafter.

23.    Interpretation.    Wherever used herein the singular number shall include the plural and the plural the singular, and the use of either gender shall include both.

24.    Not Used.

25.    Not Used.

HEIDELBERG00131

IN WITNESS WHEREOF, the parties have set their hands and seals or have caused this Agreement to be executed and delivered for and in their names by their duly authorized officers, all as of the day and year first above written.

**MSC**

**MATERIAL SERVICE CORPORATION**, a Delaware corporation

By: _____
Name: _Christoph Streicher_
Title: _Sr. VP + GM_

**PATTERSON:**

**PATTERSON 357, LLC** an Illinois limited liability company

By: _____
Name: _Jacob Mrugcez_
Title: _Manager_

## SCHEDULE 1

## REAL PROPERTY LEGAL DESCRIPTION

SCHEDULE 1

HEIDELBERG00133

EXHIBIT A

CERTAIN DEFINED TERMS

"**Ancillary Agreement**" means each of the Supply Agreement and Noncompetition Agreement.

"**Event of Bankruptcy**" means the occurrence of any one or more of the following events or circumstances:

(a)  if a Party shall file in any court a petition in bankruptcy or insolvency or for reorganization within the meaning of the Federal Bankruptcy Code, or for arrangement within the meaning of such Code (or for reorganization or arrangement under any future bankruptcy or reform act for the same or similar relief), or for the appointment of a receiver or trustee of all or a portion of the property of the filing Party;

(b)  if an involuntary petition in bankruptcy or insolvency or for reorganization within the meaning of the Federal Bankruptcy Code shall be filed against a Party, and such petition shall not be vacated or withdrawn within ninety (90) days after the date of filing thereof;

(c)  if a Party shall make an assignment for the benefit of creditors;

(d)  if a Party shall be adjudicated a bankrupt or shall admit in writing an inability to pay its debts generally as they become due; or

(e)  if a receiver shall be appointed for all or substantially all of the property of a Party by order of a court of competent jurisdiction (except where such receiver shall be appointed in an involuntary proceeding and be withdrawn within sixty (60) days from the date of his appointment).

EXHIBIT A

## LEGAL DESCRIPTION OF MINE PARCEL

PARCEL 1

THAT PART OF THE NORTHEAST FRACTIONAL QUARTER AND THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 605.45 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 45 .20 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 175.00 FEET TO A POINT ON A LINE 235 .00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 93.11 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 175.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 48.42 FEET; THENCE SOUTH 38 DEGREES 41 MINUTES 27 SECONDS WEST, 42 .05 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES IS SECONDS WEST, 1056.01 FEET; THENCE NORTH 65 DEGREES 43 MINUTES 12 SECONDS WEST, 103 .18 FEET; THENCE NORTH 12 DEGREES 38 MINUTES 21 SECONDS WEST, 235.66 FEET; THENCE NORTH 02 DEGREES OS MINUTES 28 SECONDS WEST, 230.80 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY 78.83 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET AND WHOSE CHORD BEARS NORTH 19 DEGREES 27 MINUTES 47 SECONDS WEST, 77.63 FEET TO A POINT OF TANGENCY; THENCE NORTH 36 DEGREES 50 MINUTES OS SECONDS WEST, 45.09 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY 175.42 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE RIGHT, HAVING A RADIUS OF 125.00 FEET AND WHOSE CHORD BEARS NORTH 03 DEGREES 22 MINUTES 10 SECONDS EAST, 161.38 FEET TO A POINT OF TANGENCY, SAID POINT BEING ON A LINE 60.00 FEET SOUTHEASTERLY OF AND PARALLEL WITH THE SOUTH LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD); THENCE NORTH 43 DEGREES 34 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 784.03 FEET; THENCE NORTH 88 DEGREES 35 MINUTES 14 SECONDS EAST, 695.85 FEET TO A POINT ON A LINE 60.00 WEST OF AND PARALLEL WITH THE EAST LINE OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE SOUTH 01 DEGREES 39 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 382.52 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, PERPENDICULAR TO THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER, 271.84 FEET; THENCE SOUTH 24 DEGREES 53 MINUTES 59 SECONDS WEST, 305.11 FEET; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG A LINE PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER, 447.00 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 409.41 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 2

HEIDELBERG00135

THAT PART OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN AND THAT PART OF THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG THE WEST LINE OF SAID SOUTHWEST QUARTER, 710.78 FEET; THENCE NORTH 87 DEGREES 33 MINUTES 54 SECONDS EAST, 54.59 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 87 DEGREES 33 MINUTES 54 SECONDS EAST, 486.51 FEET; THENCE SOUTH 38 DEGREES 38 MINUTES 53 SECONDS EAST, 143.30 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 871670; THENCE SOUTH 17 DEGREES 19 MINUTES 04 SECONDS WEST, ALONG SAID CENTERLINE, 292.49 FEET TO A POINT ON A SOUTHERLY LINE OF PARCEL 7 CONVEYED BY QUIT CLAIM DEED RECORDED APRIL 8, 2005 AS DOCUMENT R2005058798; THENCE NORTH 87 DEGREES 40 MINUTES 29 SECONDS WEST, ALONG SAID SOUTHERLY LINE AND ITS WESTERLY EXTENSION, 597.45 FEET; THENCE NORTH 00 DEGREES 05 MINUTES 40 SECONDS EAST, 158.84 FEET; THENCE NORTH 53 DEGREES 22 MINUTES 09 SECONDS EAST, 52.47 FEET TO A POINT OF CURVATURE; THENCE NORTHEASTERLY 113.42 FEET ALONG THE ARC OF A TANGENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 145.00 FEET, AND WHOSE CHORD BEARS NORTH 30 DEGREES 57 MINUTES 41 SECONDS EAST, 110.55 FEET TO A POINT OF TANGENCY; THENCE NORTH 08 DEGREES 33 MINUTES 12 SECONDS EAST, 61.99 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 3

THAT PART OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG THE WEST LINE OF SAID SOUTHWEST QUARTER, 246.96 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 331.22 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, 377.63 FEET; THENCE SOUTH 38 DEGREES 38 MINUTES 53 SECONDS EAST, 141.77 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, ALONG SAID CENTERLINE, 189.69 FEET; THENCE SOUTH 57 DEGREES 51 MINUTES 42 SECONDS WEST 216.48 FEET; THENCE SOUTH 87 DEGREES 33 MINUTES 54 SECONDS WEST 358.88 FEET; THENCE NORTH 02 DEGREES 14 MINUTES 17 SECONDS EAST 142.85 FEET; THENCE NORTH 23 DEGREES 48 MINUTES 30 SECONDS EAST 228.76 FEET; THENCE NORTH 65 DEGREES 36 MINUTES 35 SECONDS EAST 45.72 FEET; THENCE NORTH 07 DEGREES 21 MINUTES 50 SECONDS WEST 37.20 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 4

THAT PART OF LOTS 14, 15, 16 AND 17 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

HEIDELBERG00136

COMMENCING AT THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG THE WEST LINE OF SAID SOUTHWEST QUARTER, 186.96 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 362.28 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00 DEGREES 52 MINUTES 48 SECONDS WEST, 153.54 FEET; THENCE NORTH 85 DEGREES 56 MINUTES 17 SECONDS EAST, 25.69 FEET; THENCE NORTH 02 DEGREES 07 MINUTES 24 SECONDS WEST, 519.89 FEET; THENCE NORTH 87 DEGREES 48 MINUTES 56 SECONDS EAST, 714.30 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, ALONG SAID CENTERLINE, 602.88 FEET; THENCE SOUTH 57 DEGREES 51 MINUTES 42 SECONDS WEST, 218.94 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST 345.59, FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 5

THAT PART OF LOTS 11, 12, 13 AND 14 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID NORTHWEST QUARTER, ALSO BEING THE SOUTHWEST CORNER OF LOT 16 IN SAID HARTMAN'S SUBDIVISION; THENCE NORTH 01 DEGREES 39 MINUTES 25 SECONDS WEST, ALONG THE WEST LINE OF SAID NORTHWEST QUARTER, 540.54 FEET; THENCE NORTH 56 DEGREES 41 MINUTES 43 SECONDS EAST, 148.01 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 56 DEGREES 41 MINUTES 43 SECONDS EAST, 608.32 FEET; THENCE SOUTH 73 DEGREES 10 MINUTES 54 SECONDS EAST, 461.09 FEET; THENCE SOUTH 29 DEGREES 24 MINUTES 03 SECONDS EAST, 160.78 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, ALONG SAID CENTERLINE, 161.75 FEET; THENCE SOUTH 87 DEGREES 48 MINUTES 56 SECONDS WEST, 714.30 FEET; THENCE NORTH 11 DEGREES 40 MINUTES 30 SECONDS WEST, 22.70 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, 129.29 FEET; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 58.05 FEET; THENCE NORTH 64 DEGREES 17 MINUTES 44 SECONDS WEST, 78.46 FEET; THENCE NORTH 79 DEGREES 25 MINUTES 00 SECONDS WEST, 59.15 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 6A

THAT PART OF LOTS 8, 9, 10 AND 11 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29 AND ALSO THAT PART OF THE WEST HALF OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 29, IN TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN LYING NORTHWESTERLY OF THE CENTERLINE OF PATTERSON ROAD AS DESCRIBED IN THE PETITION RECORDED AUGUST 10, 1953 AS DOCUMENT NUMBER 733511 AND MARCH 19, 1959 AS DOCUMENT NUMBER 871670 DESCRIBED. AS FOLLOWS: BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 9; THENCE SOUTH 01 DEGREE 45 MINUTES 48 SECONDS EAST 0.27 FEET ALONG THE EAST LINE OF SAID LOT 9 TO THE NORTH LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 29; THENCE NORTH 87 DEGREES 29 MINUTES 54

HEIDELBERG00137

SECONDS EAST 411.33 FEET ALONG SAID NORTH LINE TO A POINT THAT IS 33.0 FEET NORTHWESTERLY OF, AS MEASURED PERPENDICULARLY TO, THE CENTERLINE OF SAID PATTERSON ROAD; THENCE SOUTH 44 DEGREES 41 MINUTES 16 SECONDS WEST 689.79 FEET ALONG A LINE THAT IS 33.0 FEET NORTHWESTERLY OF, AS MEASURED PERPENDICULARLY TO, SAID CENTERLINE; THENCE SOUTH 79 DEGREES 21 MINUTES 08 SECONDS WEST 136.23 FEET; THENCE NORTH 73 DEGREES 10 MINUTES 54 SECONDS WEST 519.53 FEET; THENCE NORTH 31 DEGREES 03 MINUTES 10 SECONDS EAST 255.78 FEET; THENCE NORTH 13 DEGREES 21 MINUTES 00 SECONDS EAST 278.76 FEET TO THE NORTH LINE OF SAID LOT 8, SAID LINE ALSO BEING THE SOUTH LINE OF LOT 7 IN SAID HARTMAN'S SUBDIVISION; THENCE NORTH 87 DEGREES 29 MINUTES 01 SECOND EAST 339.43 FEET ALONG THE SOUTH LINE OF SAID LOT 7 TO A POINT 165 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT 7; THENCE SOUTH 47 DEGREES 08 MINUTES 23 SECONDS EAST 231.81 FEET TO THE SOUTHEAST CORNER OF SAID LOT 8, SAID POINT ALSO BEING THE NORTHEAST CORNER OF SAID LOT 9 AND THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 6B

THAT PART OF LOT 11 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND THAT PART OF THE WEST HALF OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 87 DEGREES 31 MINUTES 36 SECONDS EAST, ALONG THE NORTH LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 29, A DISTANCE OF 411.36 FEET TO A POINT ON A LINE 33.00 FEET NORTHWESTERLY OF AND PARALLEL WITH THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511, SAID POINT ALSO BEING THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 87 DEGREES 31 MINUTES 36 SECONDS EAST, ALONG SAID NORTH LINE, 48.53 FEET TO THE CENTERLINE OF SAID PATTERSON ROAD; THENCE SOUTH 44 DEGREES 40 MINUTES 45 SECONDS WEST, ALONG SAID CENTERLINE, 677.85 FEET; THENCE SOUTH 79 DEGREES, 21 MINUTES 08 SECONDS WEST, A DISTANCE OF 58.01 FEET; THENCE NORTH 44 DEGREES 40 MINUTES 45 SECONDS EAST, ALONG SAID PARALLEL LINE, 689.98 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 7

THAT PART OF LOTS 8, 9, 10, 11, 12 AND 13 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN AND THAT PART OF THE NORTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 47 DEGREES 09 MINUTES 56 SECONDS WEST, 231.93 FEET TO A POINT 165.13 FEET WEST OF THE SOUTHEAST CORNER OF LOT 7 IN SAID HARTMAN'S SUBDIVISION; THENCE SOUTH 87 DEGREES 28 MINUTES 58 SECONDS WEST, ALONG THE SOUTH LINE OF SAID LOT 7, 699.66 FEET TO A POINT 300 FEET EAST OF (AS MEASURED ALONG THE SOUTH LINE OF SAID LOT 7) THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD

COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD), SAID POINT ALSO BEING ON AN EAST LINE OF PROPERTY CONVEYED BY QUIT CLAIM DEED RECORDED AS DOCUMENT R98-147647; THENCE SOUTH 01 DEGREES 22 MINUTES 03 SECONDS EAST, 119.78 FEET TO THE SOUTHEASTERLY CORNER OF SAID CONVEYED PROPERTY; THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, ALONG THE SOUTH LINE OF SAID CONVEYED PROPERTY, 50.00 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 02 DEGREES 31 MINUTES 03 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 210.31 FEET; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 145.50 FEET; THENCE SOUTH 02 DEGREES 31 MINUTES 03 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 43.43 FEET; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 88.22 FEET; THENCE NORTH 02 DEGREES 31 MINUTES 03 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 43.43 FEET; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 62.19 FEET; THENCE SOUTH 31 DEGREES 03 MINUTES 10 SECONDS WEST, 181.69 FEET; THENCE SOUTH 73 DEGREES 10 MINUTES 54 SECONDS EAST, 30.19 FEET; THENCE SOUTH 56 DEGREES 41 MINUTES 43 SECONDS WEST, 759.00 FEET; THENCE NORTH 01 DEGREES 24 MINUTES 46 SECONDS WEST, 253.75 FEET; THENCE SOUTH 87 DEGREES 06 MINUTES 26 SECONDS WEST, 477.31 FEET TO A POINT ON THE SOUTH LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD); THENCE NORTH 43 DEGREES 34 MINUTES 25 SECONDS EAST, ALONG SAID SOUTH LINE, 731.65 FEET TO A POINT ON THE SOUTH LINE OF PROPERTY CONVEYED BY QUIT CLAIM DEED RECORDED AS DOCUMENT R98-147647; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, ALONG SAID SOUTH LINE, 373.37 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 8

THAT PART OF THE NORTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE NORTH 01 DEGREES 39 MINUTES 25 SECONDS WEST, ALONG SAID PARALLEL LINE, 53.72 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 87 DEGREES 42 MINUTES 17 SECONDS WEST, 92.90 FEET; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, 50.67 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 77.81 FEET; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 110.79 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 171.14 FEET TO SAID PARALLEL LINE; THENCE SOUTH 01 DEGREES 39 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 59.76 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 9

THAT PART OF THE NORTHEAST FRACTIONAL QUARTER SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL, DESCRIBED AS FOLLOWS:

HEIDELBERG00139

COMMENCING AT THE SOUTHEAST CORNER OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE NORTH 01 DEGREE 39 MINUTES 25 SECONDS WEST, ALONG SAID PARALLEL LINE, 496.00 FEET; THENCE NORTH 28 DEGREES 14 MINUTES 08 SECONDS WEST, 67.23 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 88 DEGREES 35 MINUTES 14 SECONDS WEST, 626.75 FEET TO A POINT ON A LINE 45.00 FEET SOUTHEASTERLY OF AND PARALLEL WITH THE SOUTHEASTERLY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD); THENCE NORTH 43 DEGREES 34 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 417.16 FEET; THENCE NORTH 87 DEGREES 06 MINUTES 26 SECONDS EAST, 331.95 FEET; THENCE SOUTH 01 DEGREES 24 MINUTES 46 SECONDS EAST, 303.62 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 11

THAT PART OF LOTS 8, 9 AND 10 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 300 FEET EAST OF (AS MEASURED ALONG THE SOUTH LINE OF SAID LOT 7) THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD), SAID POINT ALSO BEING ON AN EAST LINE OF PROPERTY CONVEYED BY QUIT CLAIM DEED RECORDED AS DOCUMENT R98-147647; THENCE NORTH 87 DEGREES 28 MINUTES 58 SECONDS EAST, ALONG THE SOUTH LINE OF SAID LOT 7, A DISTANCE OF 360.46 FEET; THENCE SOUTH 13 DEGREES 17 MINUTES 34 SECONDS WEST, 278.88 FEET; THENCE SOUTH 31 DEGREES 03 MINUTES 10 SECONDS WEST, 74.09 FEET; THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, 62.19 FEET; THENCE NORTH 02 DEGREES 31 MINUTES 03 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 14.80 FEET; THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 88.22 FEET; THENCE SOUTH 02 DEGREES 31 MINUTES 03 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 14.80 FEET, THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 145.50 FEET; THENCE NORTH 02 DEGREES 31 MINUTES 03 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 210.31 FEET TO A POINT ON THE SOUTH LINE OF PROPERTY CONVEYED BY QUIT CLAIM DEED RECORDED AS DOCUMENT R98-14767; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, ALONG SAID SOUTH LINE AND PERPENDICULAR TO THE LAST COURSE, 50.00 FEET TO A POINT ON THE EAST LINE OF SAID CONVEYED PROPERTY; THENCE NORTH 01 DEGREES 22 MINUTES 03 SECONDS WEST, ALONG SAID EAST LINE, 119.78 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 12

THAT PART OF LOTS 9 AND 10 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

HEIDELBERG00140

COMMENCING AT THE NORTHEAST CORNER OF SAID LOT 9; THENCE NORTH 47 DEGREES 09 MINUTES 56 SECONDS WEST, 231.93 FEET TO A POINT 165 FEET WEST OF THE SOUTHEAST CORNER OF LOT 7 IN SAID HARTMAN'S SUBDIVISION; THENCE SOUTH 87 DEGREES 28 MINUTES 58 SECONDS WEST, ALONG THE SOUTH LINE OF SAID LOT 7, 699.66 FEET TO A POINT 300 FEET EAST OF (AS MEASURED ALONG THE SOUTH LINE OF SAID LOT 7) SAID SOUTHEASTERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD), SAID POINT ALSO BEING ON AN EAST LINE OF PROPERTY CONVEYED BY QUIT CLAIM DEED RECORDED AS DOCUMENT R98-147647; THENCE SOUTH 01 DEGREES 22 MINUTES 03 SECONDS EAST, 191.78 FEET TO THE SOUTHEASTERLY CORNER OF SAID CONVEYED PROPERTY; THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, ALONG THE SOUTH LINE OF SAID CONVEYED PROPERTY, 50.00 FEET; THENCE SOUTH 02 DEGREES 31 MINUTES 03 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 210.31 FEET; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 145.50 FEET TO THE POINT OF BEGINNING; THENCE NORTH 02 DEGREES 31 MINUTES 03 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 14.80 FEET; THENCE NORTH 87 DEGREES 28 MINUTES 57 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 88.22 FEET; THENCE SOUTH 02 DEGREES 31 MINUTES 03 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 58.23 FEET; THENCE SOUTH 87 DEGREES 28 MINUTES 57 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 88.22 FEET; THENCE NORTH 02 DEGREES 31 MINUTES 03 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 43.43 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 13

THAT PART OF THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 650.65 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 93.11 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 175.00 FEET TO A POINT ON A LINE 235.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE SAID FRACTIONAL QUARTER; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, ALONG SAID PARALLEL LINE, 93.11 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 175.00 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 14

THAT PART OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS:
COMMENCING AT THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG THE WEST LINE OF SAID SOUTHWEST QUARTER, 246.96 FEET TO THE POINT OF BEGINNING; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 331 .22 FEET; THENCE SOUTH 07 DEGREES 21 MINUTES 50 SECONDS EAST, 37.20 FEET; THENCE SOUTH 65 DEGREES 36 MINUTES 35 SECONDS WEST, 45.72 FEET; THENCE SOUTH 23

DEGREES 48 MINUTES 30 SECONDS WEST, 228.76 FEET; THENCE SOUTH 02 DEGREES 14 MINUTES 17 SECONDS WEST, 142.85 FEET; THENCE SOUTH 87 DEGREES 33 MINUTES 54 SECONDS WEST, 181.76 FEET TO A POINT ON THE WEST LINE OF SAID SOUTHWEST QUARTER; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, ALONG SAID WEST LINE, 403.81 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 15

THAT PART OF LOTS 13, 14, 15 AND 16 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 16 ALSO BEING THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 29; THENCE NORTH 01 DEGREES 39 MINUTES 25 SECONDS WEST, ALONG THE WEST LINE OF SAID LOT 16 ALSO BEING THE WEST LINE OF SAID NORTHWEST QUARTER, 4.25 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING NORTH 01 DEGREES 39 MINUTES 25 SECONDS WEST, ALONG SAID WEST LINE, 536.30 FEET; THENCE NORTH 56 DEGREES 41 MINUTES 43 SECONDS EAST, 148.01 FEET; THENCE SOUTH 79 DEGREES 25 MINUTES 00 SECONDS EAST, 59.15 FEET; THENCE SOUTH 64 DEGREES 17 MINUTES 44 SECONDS EAST, 78.46 FEET; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, 58.05 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 129.29 FEET; THENCE SOUTH 11 DEGREES 40 MINUTES 30 SECONDS EAST, 22.70 FEET; THENCE SOUTH 02 DEGREES 07 MINUTES 24 SECONDS EAST, 463.83 FEET; THENCE SOUTH 87 DEGREES 52 MINUTES 36 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 43.99 FEET; THENCE SOUTH 02 DEGREES 30 MINUTES 56 SECONDS EAST, 19.21 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, 347.23 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 16

THAT PART OF THE SOUTHWEST QUARTER OF SECTION 29, THE NORTHEAST FRACTIONAL QUARTER OF SECTION 30 AND THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, ALL IN TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN; AND PART OF LOTS 10, 11, 12, 13, 14, 15, AND 16 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING NORTHWESTERLY OF THE CENTERLINE OF PATTERSON ROAD AS DESCRIBED IN THE PETITIONS RECORDED AUGUST 10, 1953 AS DOCUMENT NUMBER 733511 AND MARCH 19; 1959 AS DOCUMENT NUMBER 871670, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER, 186.96 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 707.87 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINE A; THENCE NORTH 57 DEGREES 51 MINUTES 42 SECONDS EAST, 218.94 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, 302.02

HEIDELBERG00142

FEET ALONG THE CENTERLINE OF SAID PATTERSON ROAD; THENCE NORTH 38 DEGREES 38 MINUTES 53 SECONDS WEST, 141.77 FEET TO A POINT ON A LINE 60.00 FEET SOUTH OF AND PARALLEL WITH SAID LINE A; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, ALONG SAID PARALLEL LINE, 708.85 FEET TO A POINT ON THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID EAST LINE, 403.81 FEET; THENCE NORTH 87 DEGREES 33 MINUTES 54 SECONDS EAST, 540.65 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINE B; THENCE NORTH 57 DEGREES 51 MINUTES 42 SECONDS EAST, 216.48 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, ALONG SAID CENTERLINE, 123.22 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 871670; THENCE SOUTH 17 DEGREES 19 MINUTES 04 SECONDS WEST, ALONG SAID CENTERLINE, 177.95 FEET; THENCE NORTH 38 DEGREES 38 MINUTES 53 SECONDS WEST, 143.30 FEET TO A POINT ON A LINE 60.00 FEET SOUTH OF AND PARALLEL WITH SAID LINE B; THENCE SOUTH 87 DEGREES 33 MINUTES 54 SECONDS WEST, ALONG SAID PARALLEL LINE, 486.51 FEET; THENCE SOUTH 08 DEGREES 33 MINUTES 12 SECONDS WEST, 61.99 FEET TO A POINT OF CURVATURE; THENCE SOUTHWESTERLY 113.42 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE RIGHT, HAVING A RADIUS OF 145.00 FEET AND WHOSE CHORD BEARS SOUTH 30 DEGREES 57 MINUTES 41 SECONDS WEST, 110.55 FEET TO A POINT OF TANGENCY; THENCE SOUTH 53 DEGREES 22 MINUTES 09 SECONDS WEST, 52.47 FEET; THENCE SOUTH 00 DEGREES 05 MINUTES 40 SECONDS WEST, 30.93 FEET; THENCE NORTH 83 DEGREES 29 MINUTES 24 SECONDS WEST, 34.90 FEET; THENCE SOUTH 83 DEGREES 30 MINUTES 22 SECONDS WEST, 56.33 FEET TO A POINT OF CURVATURE; THENCE WESTERLY 182.16 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE RIGHT, HAVING A RADIUS OF 540.00 FEET AND WHOSE CHORD BEARS NORTH 86 DEGREES 49 MINUTES 48 SECONDS WEST, 181.30 FEET TO A POINT OF TANGENCY; THENCE NORTH 77 DEGREES 09 MINUTES 57 SECONDS WEST, 89.69 FEET TO A POINT ON THE EASTERLY EXTENSION OF A SOUTHERLY LINE OF PARCEL 8 CONVEYED BY QUIT CLAIM DEED RECORDED APRIL 8, 2005 AS DOCUMENT R2005058798; THENCE WESTERLY AND NORTHERLY ALONG SOUTHERLY AND WESTERLY LINES OF PARCEL 8 CONVEYED BY SAID QUIT CLAIM DEED FOR THE NEXT FOUR COURSES; (1) THENCE SOUTH 87 DEGREES 55 MINUTES 15 SECONDS WEST, 861.24 FEET; (2) THENCE NORTH 05 DEGREES 51 MINUTES 58 SECONDS WEST, 28.22 FEET; (3) THENCE NORTH 12 DEGREES 38 MINUTES 21 SECONDS WEST, 308.99 FEET; (4) THENCE NORTH 02 DEGREES 05 MINUTES 28 SECONDS WEST, 236.34 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY 42.45 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 70.00 FEET AND WHOSE CHORD BEARS NORTH 19 DEGREES 27 MINUTES 47 SECONDS WEST, 41.80 FEET TO A POINT OF TANGENCY; THENCE NORTH 36 DEGREES 50 MINUTES 05 SECONDS WEST, 102.55 FEET TO A POINT OF CURVATURE; THENCE NORTHWESTERLY 30.07 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 30.00 FEET AND WHOSE CHORD BEARS NORTH 65 DEGREES 33 MINUTES 12 SECONDS WEST, 28.83 FEET TO A POINT OF TANGENCY; THENCE SOUTH 85 DEGREES 43 MINUTES 42 SECONDS WEST, 20.46 FEET TO A POINT OF CURVATURE; THENCE WESTERLY 68.08 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE RIGHT, HAVING A RADIUS OF 130.00 FEET AND WHOSE CHORD BEARS NORTH 79 DEGREES 16 MINUTES 09 SECONDS WEST, 67.30 FEET TO A POINT ON A NONTANGENT LINE, SAID LINE ALSO BEING THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD); THENCE NORTH 43 DEGREES 34 MINUTES 25 SECONDS EAST, ALONG SAID SOUTHEASTERLY RAILROAD RIGHT OF WAY LINE, 1457.61 FEET; THENCE NORTH 87 DEGREES 06 MINUTES 26 SECONDS EAST, 65.33 FEET TO A POINT ON A LINE 45.00 FEET SOUTHEASTERLY OF AND PARALLEL WITH SAID SOUTHEASTERLY RAILROAD RIGHT OF

HEIDELBERG00143

WAY LINE; THENCE SOUTH 43 DEGREES 34 MINUTES 25 SECONDS WEST, ALONG SAID PARALLEL LINE, 417.16 FEET; THENCE NORTH 88 DEGREES 35 MINUTES 14 SECONDS EAST, 626.75 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINE C; THENCE NORTH 01 DEGREES 24 MINUTES 46 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 303.62 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINED; THENCE NORTH 87 DEGREES 06 MINUTES 26 SECONDS EAST, 80.03 FEET TO A POINT ON A LINE 80.00 FEET EAST OF AND PARALLEL WITH SAID LINED; THENCE SOUTH 01 DEGREES 24 MINUTES 46 SECONDS EAST, ALONG SAID PARALLEL LINE, 253.75 FEET; THENCE NORTH 56 DEGREES 41 MINUTES 43 SECONDS EAST, 759.00 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINE E; THENCE SOUTH 73 DEGREES 10 MINUTES 54 SECONDS EAST, 489.11 FEET; SAID LINE HEREINAFTER REFERRED TO AS LINE F; THENCE NORTH 79 DEGREES 21 MINUTES 08 SECONDS EAST, 194.11 FEET TO A POINT ON THE CENTERLINE OF PATTERSON ROAD PER DOCUMENT 733511; THENCE SOUTH 44 DEGREES 40 MINUTES 45 SECONDS WEST, ALONG SAID CENTERLINE, 112.51 FEET TO A BEND POINT; THENCE SOUTH 18 DEGREES 04 MINUTES 26 SECONDS WEST, ALONG SAID CENTERLINE, 161.34 FEET; THENCE NORTH 29 DEGREES 24 MINUTES 03 SECONDS WEST, 160.78 FEET TO A POINT ON A LINE 60.00 FEET SOUTHWESTERLY OF AND PARALLEL WITH SAID LINE F; THENCE NORTH 73 DEGREES 10 MINUTES 54 SECONDS WEST, ALONG SAID PARALLEL LINE, 461.09 FEET TO A POINT ON A LINE 60.00 FEET SOUTHEASTERLY OF AND PARALLEL WITH SAID LINE E; THENCE SOUTH 56 DEGREES 41 MINUTES 43 SECONDS WEST, ALONG SAID PARALLEL LINE, 756.33 FEET TO A POINT ON THE EAST LINE OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE SOUTH 01 DEGREES 39 MINUTES 25 SECONDS EAST, ALONG SAID EAST LINE, 540.54 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS; (EXCLUDING THEREFROM THE PREVIOUSLY DESCRIBED PARCEL THAT PART MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER, SAID POINT BEING THE POINT OF BEGINNING; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 792.18 FEET; THENCE SOUTH 38 DEGREES 41 MINUTES 27 SECONDS WEST, 42.05 FEET TO A POINT ON A LINE 60.00 FEET NORTH OF AND PARALLEL WITH A SOUTHERLY LINE OF PARCEL 8 CONVEYED BY QUIT CLAIM DEED RECORDED APRIL 8, 2005 AS DOCUMENT R2005058798; THENCE SOUTH 87 DEGREES 55 MINUTES 15 SECONDS WEST, ALONG SAID PARALLEL LINE, 1056.01 FEET; THENCE NORTH 65 DEGREES 43 MINUTES 12 SECONDS WEST, 103.18 FEET TO A POINT ON A LINE 60.00 FEET EASTERLY OF AND PARALLEL WITH A WESTERLY LINE OF PARCEL 8 CONVEYED BY QUIT CLAIM DEED RECORDED APRIL 8, 2005 AS DOCUMENT R2005058798; THENCE NORTH 12 DEGREES 38 MINUTES 21 SECONDS WEST, ALONG SAID PARALLEL LINE, 235.66 FEET TO A BEND POINT; THENCE NORTH 02 DEGREES 05 MINUTES 28 SECONDS WEST, ALONG SAID PARALLEL LINE, 230.80 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY 78.83 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 130.00 FEET AND WHOSE CHORD BEARS NORTH 19 DEGREES 27 MINUTES 47 SECONDS WEST, 77.63 FEET TO A POINT OF TANGENCY; THENCE NORTH 36 DEGREES 50 MINUTES 05 SECONDS WEST, 45.09 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY 175.42 FEET, ALONG THE ARC OF A TANGENT CIRCLE TO THE RIGHT, HAVING A RADIUS OF 125.00 FEET AND WHOSE CHORD BEARS NORTH 03 DEGREES 22 MINUTES 10 SECONDS EAST, 161.38 FEET TO A POINT OF TANGENCY, SAID POINT ALSO BEING ON A LINE 60.00 FEET SOUTHEASTERLY OF AND PARALLEL WITH THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY THE CHICAGO AND ALTON RAILROAD); THENCE NORTH 43 DEGREES 34 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 784.03 FEET; THENCE NORTH 88 DEGREES 35 MINUTES 14 SECONDS EAST, 695.85 FEET TO A POINT ON A

HEIDELBERG00144

LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID NORTHEAST FRACTIONAL QUARTER; THENCE SOUTH 01 DEGREES 39 MINUTES 26 SECONDS EAST, ALONG SAID PARALLEL LINE, 496.00 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS).

PARCEL 17A

THAT PART OF THE NORTHEAST FRACTIONAL QUARTER AND THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER, SAID POINT BEING THE POINT OF BEGINNING;

THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 605.45 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 409.41 FEET TO A POINT ON A LINE PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, ALONG SAID PARALLEL LINE ALSO BEING PERPENDICULAR TO THE LAST COURSE, 447.00 FEET; THENCE NORTH 24 DEGREES 53 MINUTES 59 SECONDS EAST 305.11 FEET TO A POINT ON A LINE PERPENDICULAR TO THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, ALONG SAID PERPENDICULAR LINE, 100.70 FEET; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 110.79 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 77.81 FEET; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE, 50.67 FEET; THENCE NORTH 87 DEGREES 42 MINUTES 17 SECONDS EAST 92.90 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 01 DEGREES 39 MINUTES 25 SECONDS EAST, ALONG SAID PARALLEL LINE, 53.72 FEET; TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 17B

THAT PART OF THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 87 DEGREES 47 MINUTES 50 SECONDS WEST, 60.00 FEET TO A POINT ON A LINE 60.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE SOUTH 02 DEGREES 04 MINUTES 23 SECONDS EAST, ALONG SAID PARALLEL LINE, 792.18 FEET; THENCE SOUTH 01 DEGREE 53 MINUTES 27 SECONDS EAST, 101.48 FEET; THENCE SOUTH 00 DEGREES 05 MINUTES 40 SECONDS WEST, 30.93 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 00 DEGREES 05 MINUTES 40 SECONDS WEST, 127.91 FEET TO A POINT ON A SOUTHERLY LINE OF PARCEL 8 CONVEYED BY QUIT CLAIM DEED RECORDED APRIL 8, 2005 ASDOCUMENT R2005058798; THENCE NORTH 87 DEGREES 40 MINUTES 29 SECONDS WEST, ALONG SAID SOUTHERLY LINE, 469.10 FEET TO A SOUTHERLY CORNER THEREOF; THENCE NORTH 03 DEGREES 25 MINUTES 10 SECONDS WEST, ALONG A WESTERLY LINE OF SAID

HEIDELBERG00145

PARCEL, 132.37 FEET TO A SOUTHERLY CORNER THEREOF; THENCE NORTH 87 DEGREES 55 MINUTES 15 SECONDS EAST, ALONG THE EASTERLY EXTENSION OF A SOUTHERLY LINE OF SAID PARCEL, 117.79 FEET; THENCE SOUTH 77 DEGREES 09 MINUTES 57 SECONDS EAST, 89.69 FEET TO A POINT OF CURVATURE; THENCE EASTERLY 182.16 FEET, ALONG THE ARC OF A TAN GENT CIRCLE TO THE LEFT, HAVING A RADIUS OF 540.00 FEET, AND WHOSE CHORD BEARS SOUTH 86 DEGREES 49 MINUTES 48 SECONDS EAST, 181.30 FEET TO A POINT OF TANGENCY; THENCE NORTH 83 DEGREES 30 MINUTES 22 SECONDS EAST, 56.33 FEET; THENCE SOUTH 83 DEGREES 29 MINUTES 24 SECONDS EAST, 34.90 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

PARCEL 18

THAT PART OF LOT 16 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF THE NORTHWEST QUARTER AND WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND THAT PART OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID LOT 16 ALSO BEING THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF SAID SECTION 29; THENCE NORTH 01 DEGREES 39 MINUTES 25 SECONDS WEST, ALONG THE WEST LINE OF SAID LOT 16 ALSO BEING THE WEST LINE OF SAID NORTHWEST QUARTER, 4.25 FEET; THENCE NORTH 87 DEGREES 55 MINUTES 37 SECONDS EAST, 347.23 FEET; THENCE NORTH 02 DEGREES 30 MINUTES 56 SECONDS WEST, 19.21 FEET; THENCE NORTH 87 DEGREES 52 MINUTES 36 SECONDS EAST, 43.99 FEET; THENCE SOUTH 02 DEGREES 07 MINUTES 24 SECONDS EAST, PERPENDICULAR TO THE LAST COURSE, 56.06 FEET; THENCE SOUTH 85 DEGREES 56 MINUTES 17 SECONDS WEST, 25.69 FEET; THENCE SOUTH 00 DEGREES 52 MINUTES 48 SECONDS EAST, 153.54 FEET; THENCE SOUTH 87 DEGREES 55 MINUTES 37 SECONDS WEST, 362.28 FEET TO A POINT ON THE WEST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 29; THENCE NORTH 02 DEGREES 04 MINUTES 23 SECONDS WEST, PERPENDICULAR TO THE LAST COURSE AND ALONG SAID WEST LINE, 186.96 FEET TO THE POINT OF BEGINNING, IN WILL COUNTY, ILLINOIS.

## LEGAL DESCRIPTION OF 100 ACRE PARCEL

ALL INTEREST IN AND TO THE MINERALS IN THE "SUBSURFACE AREA" OF THE LAND DESCRIBED BELOW, PROVIDED THE RIGHT INCLUDES NO RIGHTS ON THE "SURFACE" OF SUCH LAND, INCLUDING SPECIFICALLY, BUT WITHOUT LIMITATION, NO RIGHTS OF ACCESS AND NO RIGHTS OF EXTRACTION BY OPEN PIT, STRIP MINING OR ANY OTHER SURFACE REMOVAL TECHNIQUE ON SUCH LAND. THE "SURFACE" SHALL BE DEEMED TO INCLUDE AN AREA FROM THE TOP SOIL TO A DEPTH OF NO MORE THAN 100 FEET. THE "SUBSURFACE AREA" SHALL BE DEEMED TO BE THE AREA BENEATH THE SURFACE OF THE LAND DESCRIBED BELOW.

THAT PART OF THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30 AND PART OF THE WEST HALF OF THE SOUTHWEST QUARTER OF SECTION 29, ALL IN TOWNSHIP 35 NORTH, RANGE 10 EAST OF THE THIRD PRINCIPAL MERIDIAN LYING WEST OF THE CENTERLINE OF PATTERSON ROAD, AS DESCRIBED IN THE PETITIONS RECORDED MARCH 19, 1959, AS DOCUMENT NUMBER 871670, AND AUGUST 10, 1953, AS DOCUMENT NO. 733511, LYING SOUTHEASTERLY OF THE RIGHT-OF-WAY LINE OF THE ILLINOIS CENTRAL GULF RAILROAD COMPANY (FORMERLY GULF MOBILE & OHIO) WHICH SAID RIGHT OF WAY IN

HEIDELBERG0146

THE SOUTH Y2 OF SECTION 30 WAS CONVEYED TO ATCHISON, TOPEKA AND SANTA FE RAILROAD BY DEED RECORDED MAY 18, 1987 AS DOCUMENT R87-26356, DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID SOUTHWEST QUARTER SECTION 29; THENCE ON AN ASSUMED BEARING OF NORTH 88 DEGREES 49 MINUTES 44 SECONDS EAST ON THE NORTH LINE OF SAID SOUTHWEST QUARTER OF SECTION 29, A DISTANCE OF 928.45 FEET, TO THE CENTERLINE OF SAID PATTERSON ROAD, THENCE SOUTH 19 DEGREES 25 MINUTES 28 SECONDS WEST ON SAID CENTERLINE 704.94 FEET, TO A POINT ON THE NORTH LINE OF LOT 19 IN HARTMAN'S SUBDIVISION OF THE WEST HALF OF SAID SOUTHWEST QUARTER AND THE WEST HALF OF THE NORTHWEST QUARTER OF SAID SECTION 29, THAT IS 685 .57 FEET EAST OF THE NORTHWEST CORNER OF SAID LOT 19; THENCE SOUTH 18 DEGREES 39 MINUTES 45 SECONDS WEST ON SAID CENTERLINE OF PATTERSON ROAD A DISTANCE OF 470.31 FEET, TO THE POINT OF BEGINNING; THENCE NORTH 86 DEGREES 20 MINUTES 30 SECONDS WEST 530.97 FEET, TO A POINT ON THE EAST LINE OF SAID SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, THAT IS 1057.62 FEET SOUTH OF THE NORTHEAST CORNER OF SAID SOUTHEAST FRACTIONAL QUARTER; THENCE NORTH 87 DEGREES 41 MINUTES 05 SECONDS WEST (MEASURED) NORTH 86 DEGREES 20 MINUTES 30 SECONDS WEST (RECORDED) 536.03 FEET; THENCE NORTH 03 DEGREES 17 MINUTES 14 SECONDS WEST (MEASURED) NORTH 01 DEGREE 56 MINUTES 39 SECONDS WEST (RECORDED) 132.42 FEET; THENCE SOUTH 87 DEGREES 54 MINUTES 57 SECONDS WEST (MEASURED) SOUTH 89 DEGREES 15 MINUTES 32 SECONDS WEST (RECORDED) 1166.21 FEET; THENCE SOUTH 43 DEGREES 26 MINUTES 31 SECONDS WEST 1282.40 FEET; THENCE SOUTH 22 DEGREES 18 MINUTES 09 SECONDS EAST 916.93 FEET, TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, AT A POINT 2301.32 FEET WEST OF THE SOUTHEAST CORNER OF SAID FRACTIONAL QUARTER OF SECTION 30, THENCE NORTH 87 DEGREES 47 MINUTES 52 SECONDS EAST 2282.72 FEET (DEED) 2288.72 FEET (MEASURED), ALONG SAID SOUTH LINE OF THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 30, TO SAID CENTERLINE OF PATTERSON ROAD; THENCE NORTH 17 DEGREES 19 MINUTES 02 SECONDS EAST (MEASURED) NORTH 19 DEGREES 26 MINUTES 50 SECONDS

HEIDELBERG00147

**Exhibit B**

## AGGREGATE SUPPLY AGREEMENT

**THIS AGGREGATE SUPPLY AGREEMENT** (this "**Supply Agreement**") is made and entered into as of the 1st day of January, 2016 ("**Effective Date**"), by and between **MATERIAL SERVICE CORPORATION**, a Delaware corporation, having its principal place of business in Irving, Texas ("**MSC**"), and **PATTERSON 357, LLC**, an Illinois limited liability company having its principal place of business in Bartlett, Illinois ("**Patterson**"). MSC and Patterson may be referred to individually as a "Party" or collectively as the "Parties."

### WITNESSETH:

**WHEREAS**, MSC is engaged in the business of marketing and selling construction aggregates ("**Aggregates**"); and

**WHEREAS**, simultaneously herewith MSC and Patterson are entering into that certain Marketing and Sales Agreement of even date herewith ("**Agreement**"), pursuant to which MSC has been granted the exclusive right to market, sell and offer for sale aggregates that are produced and processed by Patterson in Joliet, Illinois (the "**Property**"); and

**WHEREAS**, Patterson wants to purchase Aggregates from MSC, and MSC wants to sell Aggregates to Patterson, all as set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants contained herein, and other good and valuable consideration the receipt and sufficiency are hereby acknowledged, MSC and Patterson hereby agree as follows.

1.  **Sale and Purchase of Aggregates; Quantities.** On an annual basis, from and after January 1, 2016 (the "**Commencement Date**"), Patterson, directly or through its Affiliates, agrees to submit a bona fide offer to purchase at least 500,000 tons of Aggregates ("**Annual Quantity**") from MSC and/or its Affiliates; provided, however, that (i) such Annual Quantity shall specifically exclude any amount purchased by Patterson from MSC's Thornton Mine up to a total of 180,000 Tons of Aggregates per year ("**Thornton Aggregates**"); and (ii) such Annual Quantity shall include no more than 50,000 tons of chips from MSC's site in McCook, Illinois. Except as specifically set forth in this Section 1, MSC may provide all or any portion of the foregoing Annual Quantity, in MSC's sole discretion, from any of its quarries or those of its Affiliates.

If a sufficient supply of Aggregates is available and Patterson fails to submit a bona fide offer to purchase the Annual Quantity during any applicable period, then at the option of MSC, which option shall not be allowed to lapse without reasonable justification, and upon written notice to Patterson, the Term may be extended for up to one year in order for Patterson to purchase the amount equal to the total of all deficits in bona fide offers to purchase of the Annual Quantity.

Capitalized terms not defined herein shall have the meanings set forth in Exhibit A attached hereto and titled "**Defined Terms**".

HEIDELBERG00148

2. **Term**. This Supply Agreement is effective as of the Commencement Date of the Agreement and shall terminate at the expiration of the Term, as defined in Section 1 of the Agreement.

3. **Operating Committee Meeting; Bona Fide Offer to Purchase; Market Price for Delivered Aggregates; MSC's Option to Sell; Invoices and Payments; Terms.**

(a) Operating Committee Meeting. On or before February 1 of each calendar year of the Term or any extension thereof, the Operating Committee shall meet pursuant to Section 13 of the Agreement to review Aggregate orders and pricing.

(b) Not less than seven (7) days prior to the Operating Committee meeting, Patterson shall submit to MSC a bona fide offer to purchase either directly or through its Affiliates the Annual Quantity of Aggregates for the calendar year. The bona fide offer to purchase shall include Aggregate orders that reasonably contemplate product availability, quarry capacity, output, and market pricing. MSC will have thirty (30) days after its receipt of the offer to provide notice to MSC that said offer, or specific portions thereof, was accepted, and if no such notice is provided, the offer is deemed to have been rejected. In its notice, MSC shall specify which aggregate types and quantities have been accepted and, in accordance with a schedule agreed upon by the Operating Committee, shall supply said materials at a delivered price equal to the price contained in the bona fide offer to purchase.

(c) As part of its submission of a bona fide offer pursuant to Section 3(b) and in support thereof, Patterson shall provide an offer to MSC that Patterson has received from a third party aggregate supplier (a Patterson Affiliate is not considered to be a third party for purposes of this Section 3) to sell and deliver aggregates to the jobsite, plant or other location to which Patterson is required to provide aggregates, and the amount of said offer must be equal in amount to the bona fide offer submitted to MSC pursuant to Section 3(b) above.

(d) The price(s) for the Aggregates that MSC sells to Patterson hereunder shall be the lowest gross sales price(s) that MSC has invoiced any other customer for Aggregates of equivalent type, volume, end use, and MSC plant location within three (3) calendar months prior to and one (1) month after the acceptance by MSC of Patterson's bona fide offer submitted pursuant to Section 3(b) above. In the event that MSC sells Aggregates of the equivalent type, volume, end use, product mix, plant location, and delivery distance to another customer within one (1) month after acceptance by MSC of Patterson's bona fide offer submitted pursuant to Section 3(b) above, MSC shall provide Patterson with a "rebate" of the difference in the per ton price for the Aggregates sold to Patterson within thirty (30) calendar days of the delivery of Aggregates to the customer at a lower price.

(e) Upon the occurrence of the following, Patterson will have fulfilled its annual obligations under this Supply Agreement: (i) Patterson's submission of the bona fide offer to purchase the Annual Quantity; (2) MSC's acceptance or rejection, in whole or in part, of

HEIDELBERG00149

the bona fide offer to purchase; and (3) Patterson's payment to MSC for all Aggregates sold by MSC to Patterson pursuant to this Section 3.

(f) In accordance with <u>Section 13</u> of the Agreement, the Operating Committee shall meet at least quarterly to discuss adjustments to and/or variations on: (i) Patterson's bona fide offer to purchase; (ii) job, plant or site delivery location; or (iii) production capacity and scheduling.

(g) In addition to all of the foregoing, Patterson shall provide MSC with a "last look" at aggregate supply requests issued by Patterson or its Affiliates to third party aggregate suppliers and the offers from said suppliers. MSC shall have three (3) days after receipt of the lowest bona fide third party aggregate supplier offer to match the price within said offer and sell Aggregates to Patterson or its Affiliates to fill the supply request. If MSC chooses to match the lowest price in accordance with the preceding sentence, Patterson shall purchase the Aggregates from MSC at said price. Patterson's offer to purchase set forth in this <u>Section 3(f)</u> will not be considered as satisfaction, in whole or in part, of Patterson's obligations set forth in <u>Section 1</u> of this Supply Agreement.

(h) <u>Invoices and Payments</u>. On or about the tenth (10th) day of each calendar month following the Commencement Date, MSC shall provide a statement of all outstanding invoices to Patterson for all Aggregates supplied during the immediately preceding calendar month. Each statement or invoice shall show the quantity of Aggregates supplied during the immediately preceding calendar month. Patterson shall pay the total amount of all invoices due as shown on the statement on or before the thirtieth (30th) day of the calendar month immediately following the calendar month in which Aggregates were supplied. If Patterson fails to pay any invoice, or portion thereof, when due hereunder, then Patterson shall also pay to MSC, not as a penalty but as a late payment charge, a sum equal to one percent (1%) of the amount due. Any payment of any invoice, or portion thereof, which shall not be paid after the applicable due date and which remains unpaid thirty (30) business days after written notice from MSC that the amount is due and unpaid, shall also bear interest at the rate of 3% per annum from the date when the same was due and payable under the terms of this Supply Agreement until the same be paid.

(i) <u>Terms</u>. The Standard Terms and Conditions of MSC attached hereto as <u>Exhibit B</u> are incorporated herein and shall apply to each purchase of Aggregates hereunder. In the event that the Standard Terms and Conditions conflict with or are inconsistent with the terms of this Supply Agreement, the terms of this Supply Agreement shall control.

4. **<u>Quality, Disclaimer of Warranties, Remedy</u>.**

(a) <u>Quality</u>. The Aggregates to be sold and delivered to Patterson hereunder shall conform to the specifications applicable to the project for which the Aggregates will be sold.

HEIDELBERG00150

(b)    _Disclaimer of Warranties_.  **ALL WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE OR ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE AND ALL OTHER WARRANTIES ARE SPECIFICALLY EXCLUDED.**

(c)    _Remedy_.  In the event that Patterson fails to submit a bona fide offer to purchase the Annual Quantity, or otherwise breaches this Supply Agreement, then in addition to all other remedies available to MSC at law or in equity as a result of such breach (all of which are hereby required by MSC), MSC shall be entitled to a reduction in the Royalty under the Agreement, until Patterson satisfactorily remedies such failure or breach, which reduction shall be in accordance with the formula set forth in the Agreement.

5.    **Notices.**  Except as otherwise expressly stated in this Supply Agreement, any such notice or approval, disapproval or other communication shall be in writing to the other Party and shall be deemed to have been duly given when delivered in person or when actually received (as evidenced by receipt of an overnight delivery service of national reputation or after posting by United States Certified Mail, Return Receipt Requested), with postage prepaid, addressed as follows, with copies which shall not be required for notice:

To MSC:      Material Service Corporation
2235 Enterprise Drive - Suite 3504
Westchester, IL 60154
Attn: Christoph Streicher

Copy to:      Lehigh Hanson, Inc,
7660 Imperial Way
Allentown, PA 18195
Attn: Regional Counsel

To Patterson:      Patterson 357, LLC
2250 Southwind Blvd.
Bartlett, IL 60103
Attn: Jacob Mrugacz

By written notice to the other Party given in the manner contemplated hereby either Party shall have the right to change its notice address to such other address or addresses as such Party shall designate in such notice.

6.    **Dispute Resolution.**    The Parties agree that they will resolve all disputes as provided under the terms of Section 14(c) of the Agreement.

7.    **Force Majeure Event.**  .  As used in this Agreement, a **"Force Majeure Event"** shall have the same meaning as set forth in the Agreement and upon the occurrence of a Force Majeure Event as set forth in the Agreement, then the performance of the Parties under this Supply Agreement shall be suspended or terminated to the degree performance of the Parties under the Agreement is suspended or terminated.

4

HEIDELBERG00151

**8.** **Miscellaneous.** The following miscellaneous provisions shall govern this Agreement:

(a) **Assignment.** Patterson may not assign this Supply Agreement or all or any part of its rights or obligations hereunder to any other person or entity, either voluntary or by operation of law, without first obtaining MSC's prior written consent. A Change in Control shall be considered an assignment under this Section 8(a). The obligations of MSC and Patterson under this Supply Agreement shall remain in effect notwithstanding any Change in Control of Patterson or MSC, and any purchaser of Patterson's or MSC's assets, partnership interest, stock or other equity interest giving rise to the Change in Control, including any subsequent purchaser(s), shall remain subject to the obligation to purchase or supply (as applicable).

(b) **Interpretation.** MSC and Patterson shall be deemed to have participated equally in the preparation of this Supply Agreement, and consequently this Supply Agreement shall not be construed more strictly against one Party than against the other Party. The topical headings used in this Supply Agreement have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms and provisions of this Supply Agreement. As used herein, any gender shall include any other gender, the singular shall include the plural, and the plural shall include the singular, wherever appropriate.

(c) **Severability.** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof unless it substantially and adversely affects the value of this Supply Agreement to one of the Parties; and in the absence of any such substantial and adverse effect, this Supply Agreement shall be construed in all respects as is such invalid or unenforceable provision were omitted.

(d) **Counterparts.** This Supply Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but all of which shall collectively constitute one and the same instrument.

(e) **Waiver of Remedies.** The failure of any Party to insist in any one or more instances upon strict performance of any of the provisions of this Supply Agreement or to take advantage of any of its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.

(f) **Governing Law; Negotiation Regarding Disputes; Consent to Jurisdiction and Venue; Waiver of Jury Trial.**

(1) **Governing Law.** This Supply Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Illinois or any other jurisdiction) that would cause the application hereto of the laws of any jurisdiction other than the

5

HEIDELBERG00152

laws of the State of Illinois. Without limiting the generality of the foregoing: (A) the internal law of the State of Illinois shall control the interpretation and construction of this Supply Agreement, even though under any other jurisdiction's choice of law or conflict of law analysis the substantive law of some other jurisdiction ordinarily would apply; and (B) the Parties specifically exclude the application of the United Nations Convention on Contracts for the International Sale of Goods to this Supply Agreement, to the contractual relationship created under this Supply Agreement, and to the construction, validity, enforcement, and interpretation of this Supply Agreement.

(2) Negotiation Regarding Disputes; Consent to Jurisdiction and Venue; Waiver of Jury Trial. The Parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Supply Agreement. The Parties further agree that in the event any dispute between them relating to this Supply Agreement, including, without limitation, if either Party is forced to seek enforcement of the decision of the Arbitrator (as defined in Section 14(c) of the Agreement), as provided in Section 6 above, then exclusive jurisdiction shall be in the state courts located within Will County, Illinois, or in the United States District Court for the Northern District of Illinois. Each Party hereby (A) submits to the jurisdiction of such courts and agrees that all such claims in respect of the action or proceeding may be heard and determined in any such court; (B) agrees to bring any action or proceeding in such courts and not to bring any other action in any other court; (C) waives any objection to venue and any claim of inconvenient forum with respect to any such action or proceeding so brought and waives any bond, surety, or other security that might be required of any Party with respect thereto; and (D) agrees that a final judgment in any such action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity, any objections as to jurisdiction or venue in such court being expressly waived. PATTERSON AND MSC HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS SUPPLY AGREEMENT OR THE ACTIONS OF THE PARTIES IN THE NEGOTIATIONS, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

(3) Costs and Attorneys' Fees. In the event of any litigation between the Parties hereto arising from or with respect to this Supply Agreement, the breach of any warranty, representation or breach of any other terms hereof, and/or the performance of the obligations hereunder, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party in connection with such litigation, including but not limited to reasonable attorneys' fees and costs, reasonable accountant's fees and costs, and reasonable expert fees and costs, whether incurred at the pre-trial, trial or appellate levels, and/or bankruptcy or other creditors rights' proceedings.

(g) Liability. Each party's liability to the other for any breach of this Supply Agreement shall be limited to direct damages only, and such direct damages shall be the sole and exclusive remedy hereunder, and all other remedies or damages are waived. In no event shall

6

HEIDELBERG00153

either party be liable on account of such breach for any consequential, incidental, punitive or exemplary damages, in tort, contract or otherwise.

        (h)    <u>Entire Agreement</u>.  This Supply Agreement and the Exhibits hereto represent the entire agreement between the Parties hereto as to the purchase and sale of aggregate materials, and there are no collateral oral agreements or understandings between the said Parties. The Parties are or may be parties to other agreements, including but not limited to cement supply agreement, transportation agreement or other agreements.  All additions, variations, or modifications of this Supply Agreement shall be totally void and ineffective unless they are in writing and signed by both Parties.

HEIDELBERG00154

**IN WITNESS WHEREOF**, the Parties, and with the intent to be bound, have executed this Agreement as of the Effective Date.

MSC:                                    PATTERSON:

**MATERIAL SERVICE**              **PATTERSON 357, LLC**
**CORPORATION**

By: _____      By: _____
Name: _Christoph Streicher_       Name: _Jacob Mayger_
Title: _Sr. VP + GM_              Title: _Manager_

8

HEIDELBERG00155

## EXHIBIT A

### Definitions

(a)    "**Affiliate**" means, with respect to any Person, at the time in question, any other Person controlling, controlled by or under common control with such Person. For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(b)    "**Change in Control**" shall mean, with respect to Patterson: (i) any transfer or other disposition of more than fifty percent (50%) of the capital stock or equity interests of Patterson at any time in one transaction or a series of related transactions with the same party or affiliated group of parties (other than any such transaction with an Affiliate of the transferring holders), (ii) any merger or consolidation of Patterson with or into any other Person, at the conclusion of which transaction the holders of more than fifty percent (50%) of the total capital stock of Patterson immediately prior to the transaction and their Affiliates hold less than fifty percent (50%) of the total capital stock of the successor entity immediately following the transaction, (iii) any sale, transfer or other disposition of all or substantially all of the assets of Patterson (other than any such transfer to an Affiliate of the holders of fifty percent (50%) or more of the units or other designation of equity ownership of Patterson), or (iv) any transfer of the fee simple ownership of the real property which is subject to the Agreement or any portion thereof.

(c)    "**Person**" means any natural person, governmental entity, any for-profit corporation, not-for-profit corporation, general partnership, limited partnership, limited liability company, trust, business trust, business association or other legally recognized association of persons.

(d)    "**Royalty Payments**" shall mean those certain payments under Sections 1 and 2 of the Royalty Agreement.

(e)    "**Thornton Mine**" shall mean the quarry located at 322 South Williams Street Thornton, Illinois 60476.

(f)    "**Ton(s)**" shall mean and refer to record short ton(s) containing 2,000 pounds avoirdupois each. All tonnage measurements shall be based on the actual weights of the Aggregates with no adjustments made for moisture content or otherwise.

HEIDELBERG00156

**EXHIBIT B**

<u>**STANDARD TERMS AND CONDITIONS**</u>

[Attached]

**EXHIBIT B**

10

HEIDELBERG00157

## GENERAL TERMS AND CONDITIONS OF SALE

1. All references in this document to "Seller" shall include Lehigh Hanson, Inc. and/or any subsidiary or affiliate of Lehigh Hanson, Inc. (including any division of the foregoing ) performing any or all of the scope hereunder, whether or not specifically identified herein. Applicant (hereinafter "Purchaser") further agrees that the following terms and conditions will apply to all sales of goods or services by Seller to Purchaser ("Sales").

2. All matters between Seller and Purchaser, including sales, will be governed by the laws of the state in which the delivery of goods or services by Seller to Purchaser is to occur. All indebtedness due is payable at Seller's office identified in the invoice or billing for such payment, unless and until Seller designates a different place of payment. Invoices shall be deemed correct unless contested in writing within seven (7) business days of receipt.

3. Purchaser agrees that any terms and conditions appearing on any document submitted by Purchaser which are in conflict with (i) the terms and conditions contained herein, (ii) any quotation submitted by Seller, or (iii) any sales contract between Seller and Purchaser shall be hereby expressly rejected and shall not constitute terms of any sale of goods or services by Seller. The foregoing shall apply to all documents heretofore or hereafter submitted by Purchaser, whether executed by Seller or not.

4. Prices in quotations made by Seller are subject to change without notice, and all quotations expire and become invalid if not accepted within 30 days from the date of issue, unless otherwise noted by Seller in writing. Price extensions when made are for Purchaser's convenience only, and they, as well as any mathematical, stenographic or clerical errors, are not binding on Seller. Prices shown may not include any sales, excise, or other governmental tax or charge payable by Seller to Federal, State or local authority. Any taxes now or hereafter imposed upon sales of shipments will be added to the purchase price. Purchaser agrees to reimburse Seller for any such tax or to provide Seller with an acceptable and authorized tax exemption certificate.

5. Any order for goods or services by Purchaser shall constitute a representation that Purchaser is solvent. In addition to Seller's right under the Uniform Commercial Code, if in the judgment of Seller, the financial condition of the Purchaser at the time of shipment does not justify the terms of payment specified, Seller reserves the right to require from Purchaser full or partial cash payment or other adequate assurance of performance before shipment. Seller reserves the right to suspend its performance until such payment or adequate assurance of performance has been received. Purchaser agrees that all funds owed to Purchaser from anyone or received by Purchaser to the extent those funds result from the materials supplied by Seller shall be held in trust for the benefit of Seller (the Trust Funds). Purchaser agrees it has no interest in the Trust Funds held by anyone and to promptly account for and pay to Seller all such Trust Funds. Seller maintains the right to periodically review and adopt payment terms as necessary and to curtail, modify or eliminate any credit availability or credit limit within its sole discretion.

6. Purchaser agrees to pay Seller all costs and expenses of collection, suit, or other legal action, including all actual attorneys' and paralegal fees, incurred through trial, on appeal, or in any administrative proceedings brought as a result of the commercial relationship between them. Any cause of action which Seller may have against Purchaser may be assigned by Seller. Unless otherwise stated on the invoice or other writing from Seller, payment terms are Net 30 EOM. Payment is due in the form of cash, cash equivalent, check, or money order. Seller may apply Purchasers' payment against any open charges which Seller's sole discretion. On past due accounts Seller may impose a monthly finance charge to the higher of one and one-half percent per month or the maximum interest charge permitted to be charged by the law governing the account between Purchaser and Seller. The finance charge shall not accrue until Seller confirms to accrue after Seller obtains a judgment against Purchaser. This Seller has the right to exercise setoff or recoupment when needed to satisfy an outstanding debt. All agreements between Seller and Purchaser (and any affiliate or subsidiary of Purchaser) shall be considered as one single integrated agreement between Seller and Purchaser.

7. Purchaser agrees to pay reasonable storage fees if materials are stored on Seller's yard more than sixty (60) days after Seller is ready for delivery.

8. Seller will not be responsible for delays in production or delivery for any reason resulting from fire, flood, force majeure, strikes, lockouts, difference with workers, accidents, war, insurrection, delays in transportation, equipment failure, shortage of cars, trucks, fuel or materials, governmental interference or regulation, acts of God or for any other reason beyond the Seller's reasonable control. Seller reserves the right to adjust prices due to delays, shortage, or increased costs of materials or transportation.

9. THE FOLLOWING IS IN LIEU OF ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND OF ANY OTHER OBLIGATION ON THE PART OF THE SELLER. Seller warrants that at the time of delivery, the quality of materials and workmanship of Seller's goods or services will conform to the requirements of the specifications set forth in the applicable sales contract(s), quotation, or to Seller's standard manufacturing practice. If the goods or services furnished by Seller fail to conform, at time of delivery, to Seller's warranty, Seller's sole and exclusive liability will be to repair or replace (at Seller's discretion), f.o.b. Seller's plant with full freight allowed to the jobsite, or upon mutual agreement to credit Purchaser's account. If repair or replacement is made, Seller will have a reasonable time to make such repair or replacement. Notice of defective goods or services must be given to Seller immediately upon discovery of the defect, notwithstanding the foregoing, final notice of any defect must be given within thirty (30) days from the date of delivery of such goods or services. Seller's liability, whether under contract, in tort or otherwise shall not in any event exceed the price of the goods or services or portion of such goods or services on which such liability is based, and Purchaser waives any claim for amount in excess of that amount. IN NO EVENT SHALL SELLER BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES DIRECTLY OR INDIRECTLY ARISING FROM THE SALE, HANDLING OR USE OF THE GOODS OR SERVICES OR FROM ANY OTHER CAUSE OR BREACH INCLUDING, BUT NOT LIMITED TO BREACH OF WARRANTY OR NEGLIGENCE.

10. No legal action shall be brought by the Purchaser against the Seller for any claim with respect to any goods or services sold by Seller to Purchaser more than one (1) year after delivery of such goods or services to the Purchaser. It is agreed that any cause of action with respect to such goods or services will accrue on the date of delivery of such goods or services. If any provision hereof is held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision will be of no force and effect, but the legality or unenforceability will have no effect upon and will not impair the enforceability of any other provision of this document.

11. A counterpart of this document delivered by facsimile or electronic transmission shall be deemed an original document and be valid for all purposes. If Seller electronically stores this document in the manner known as "scanning", a reproduction from the scanned document shall be considered to be an original counterpart and shall be enforceable. The Electronic Signatures in Global and National Commerce Act (P.L. No. 106-229) or the Uniform Electronic Transactions Act (or its equivalent in Illinois, New York and Washington) apply to this document and to all Sales. Electronic and digital signatures may be used by either party.

12. Purchaser and Seller represent and agree that there are no third party beneficiaries to this document and that Purchaser and Seller are the sole intended beneficiaries of this document and all Sales.

13. When applicable, the terms of Executive Order 11246 and 41 C.F.R. Part 60-1 shall apply to this document and to all Sales.

14. As a standard practice, Seller offers electronic invoicing to its customers. Purchaser must contact Seller if Purchaser does not wish to receive electronic invoicing.

LH rev. 2012/04

HEIDELBERG00158

**Exhibit C**



Central Case Management Center
Kathleen Gossett-Cantrell
Assistant Vice President
13727 Noel Road
Suite 1025
Dallas, TX 75240
Telephone: (972)702-8222
Fax: (855)267-4082

August 2, 2024


William J. Quinlan, Esq.
The Quinlan Law Firm, LLC
233 South Wacker Drive
61st Floor
Chicago, IL 60606
Via Email to: wjq@quinlanfirm.com

Paul C. Carroll, Esq.
Gould & Ratner, LLP
222 North LaSalle Street
Suite 800
Chicago, IL 60601
Via Email to: pcarroll@gouldratner.com


Case Number: 01-24-0005-6652


Patterson 357, LLC
-vs-
Heidelberg Materials Midwest Agg, Inc. f/k/a
Aggregates Midwest, Inc.

Dear Parties:

This will confirm the appointment of Mitch Marinello, Joseph Gagliardo and Peter V. Baugher as arbitrators in the above matter.  Mr. Baugher will serve as chair arbitrator.

Please provide your availability for a Preliminary Hearing conference call using the when2meet.com online calendar which takes into consideration everyone's availability.

   **https://www.when2meet.com/?25792590-nKShP**

To indicate your availability, please click on the above link, enter your full name where indicated, and highlight the times that you are available. All parties' availability is compiled and displayed as it is entered and entries are saved instantly. All times displayed on the online calendar are in your local time zone. When complete the webpage may be closed. Please provide your availability via when2meet.com by **August 5, 2024**.

Enclosed, please find a scheduling order template, which covers items to be discussed at the preliminary hearing and will be completed by the arbitrator(s). The parties are encouraged to confer in advance of the preliminary hearing to discuss and reach agreement on as much of the schedule as possible. Any dates that are agreed upon should be sent in prior to the preliminary hearing.

Please review the attached Billing Information Sheet regarding the AAA's billing practices.

If you have any questions, please let me know.

Sincerely,

*/s/ Carissa Langston*

Carissa N Langston
Manager of ADR Services
Direct Dial: (972)774-6913
Email: CarissaLangston@adr.org
Fax: (855)267-4082

Enclosure

cc:    Alison L. Constantine, Esq. w/encl. Via Email Only
        Lisa H. Quinlan, Esq. w/encl. Via Email Only
        Matthew N. Spinner w/encl. Via Email Only
        Eric Schmitt, Esq. w/encl. Via Email Only
        Mark D. Brookstein, Esq. w/encl. Via Email Only
        Krystina Jonsson, Esq. w/encl. Via Email Only
        Mitchell L. Marinello, Esq. w/encl. Via Email Only
        Joseph M. Gagliardo, Esq. w/encl. Via Email Only
        Peter V. Baugher, Esq. w/encl. Via Email Only



**Billing Information Sheet**

**Deposits –** After the preliminary management hearing, the arbitrator will notify the case manager how much time is anticipated for the arbitration process. The Manager of ADR Services will then notify the parties of this amount. Once billing is entered into our system an invoice is automatically generated and transmitted within 2 weeks. Should you need an immediate copy to expedite payment please contact your case manager. Your Invoice/Statement includes a list of "Payment Options." If paying by check, please make it payable to "American Arbitration Association" and send it to your case manager's attention at the office address specified on the "Payment Options" page of your Invoice/Statement. These deposits are typically due thirty days prior to the evidentiary hearings, but this may vary depending on the schedule specific to this case.

At the conclusion of the preliminary management hearing, the parties' representatives and the Manager of ADR Services may discuss the AAA's billing and deposit practices with regard to covering the arbitrator's anticipated fees and expenses for the entire proceeding. We ask that the representatives discuss this with their clients prior to the conference so that any questions they may have can be addressed.

Deposits are typically due thirty days prior to the first evidentiary hearing and failure to make deposits by the established due date may result in the arbitrator suspending the proceeding. Therefore, please comply with all established due dates for payment in order to avoid interruption in the progress of the case. All unused deposits shall be promptly refunded.

Parties are also reminded that you may view case financial information, as well as make payments with a credit card online via AAA's WebFile.

Compensation to the arbitrator represents an independent obligation of the parties, and it is understood that the AAA has no liability, direct or indirect, for such payment. Each party shall promptly deposit in advance with the AAA such sums of money as required by the administrator to defray the costs of the arbitrator(s) fees. Compensation incurred will be deducted from deposits on hand, if any.

**Abeyance Fee –** Should parties agree; it is the policy of the Association to hold cases in abeyance for up to one year. The parties may continue to hold the matter in abeyance beyond that period providing they remit a payment of $500.00 to the AAA to cover the administrative expense of continued tracking of such cases.

**Final Fee –** The Final Fee covers all AAA services from the time a hearing is scheduled to when the case is awarded, settled or withdrawn. The Final Fee is billed after an arbitrator has been appointed and a hearing has been scheduled and is payable in advance of the first scheduled hearing. The Final Fee will be incurred for all cases that proceed to their first evidentiary regardless of whether that hearing is held in person, via video conference, or via telephone and is payable by each party filing a claim or counterclaim, pursuant to the applicable fee schedule. If a hearing does not take place, the Final Fee will be fully refunded if the parties provide at least 24 hours' notice prior to the hearing.

**Refund Schedule –** The AAA has a refund schedule in the administrative fee section of the Rules. After 60 days of the AAA's receipt of the Demand or the appointment of the arbitrator the filing fees are non-refundable. The AAA will only refund filing fees as outlined in the Rules and does not refund arbitrator costs incurred when parties settle their dispute or withdraw their claims. The date of receipt by the AAA of the demand for arbitration will be used to calculate refunds of both claims and counterclaims.

**Exhibit D**

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

Case Number: 01-24-0005-6652

Patterson 357, LLC; Tex Pasley; Will Wanberg;
Rebecca Amen
-vs-
Heidelberg Materials Midwest Agg, Inc. f/k/a
Aggregates Midwest, Inc.

## FINAL ARBITRATION AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in
accordance with the arbitration agreement entered between the above-named
parties and having been sworn, and having heard the proofs and allegations of the
Parties, hereby AWARD as follows:

### Background

Claimant Patterson 357, LLC ("Patterson") is an Illinois limited liability
company that operates a mine in Joliet, Illinois that produces aggregates.
Respondent Heidelberg Materials Midwest AGG, Inc., formerly known as Hanson
Aggregates Midwest, Inc. ("Heidelberg") is a Kentucky corporation that owns and
operates quarries or mines and aggregate facilities throughout northern Illinois.
Patterson and Heidelberg are parties to an Aggregate Marketing and Sales
Agreement dated February 1, 2016 (Joint Exhibit 21, the "Sales Agreement") and
an Aggregate Supply Agreement dated January 1, 2016 (Joint Exhibit 20, the
"Supply Agreement"). The parties concurrently entered into a Noncompetition
Agreement dated February 1, 2016 (Joint Exhibit 19), not at issue in this
arbitration.

The term of these agreements is long, running initially from January 1, 2016,
through December 21, 2022, then at Heidelberg's option for seven consecutive

additional seven-year terms, potentially to December 31, 2071. (Sales Agreement, Sec. 1(a).) Heidelberg exercised its first seven-year renewal in October 2021 (Bottom, Tr. 323-329.)

The parties' Agreements prescribe a detailed and broadly applicable process for resolving disputes. Sales Agreement Sec. 14(c), incorporated in the Supply Agreement under Sec. 6 of that Agreement, states:

"If any disagreement arises between the Parties concerning any matters set forth in this Agreement, related to this Agreement, or arising between the Parties as a result of this Agreement (a "Dispute"), and the Parties are unable to resolve the Dispute by negotiation pursuant to the provisions of Section 14(a) and (b) or through the Operating Committee, then the Dispute may only be settled by mandatory, binding arbitration in accordance with this Section 14(c) (unless otherwise specifically provided in Section 14(d) below), and judgment on the award rendered in such arbitration may be entered in any court having jurisdiction." [Highlighting omitted.]

Sec. 14 further directs a three-arbitrator American Arbitration Association arbitration in Chicago "conducted in accordance with the Expedited Procedures under AAA Rules then prevailing." Sec. 15 of the Sales Agreement provides that Illinois law is to govern as does Sec. 8(f)(1) of the Supply Agreement.

Patterson initially brought the dispute to be resolved in this arbitration as a lawsuit in Will County, Illinois. Verified Complaint for Declaratory, and Other Relief, No. 2023MR000105 (March 23, 2023). Heidelberg demanded Patterson withdraw its Complaint in view of the parties' arbitration process (Letter April 6, 2023, Respondent's Pre-Hearing Brief Ex. J-17), later that month invoking Sec. 14's arbitration provisions (Letter April 27, 2023, Respondent's Pre-Hearing Brief Ex. R-22). Heidelberg removed Patterson's suit to the U.S. District Court for the Northern District of Illinois, and moved to dismiss the case or in the alternative to compel arbitration. Judge John F. Kness' Memorandum Opinion and Order ruling on Heidelberg's motions denied Heidelberg's motion to dismiss, granted its motion to compel arbitration, and stayed the litigation pending arbitration proceedings. *Patterson 357, LLC v. Heidelberg Materials Midwest Agg, Inc.*, No. 23-cv-02831 (March 27, 2024) (Respondent's Exhibit 27). This AAA arbitration followed.

**Disposition Summary**

For decision are three questions: (1) Did Heidelberg breach the Sales Agreement by withholding $110,270.16 due under the 2022 annual royalty due in early 2023? (2) Is Heidelberg entitled to offset Patterson's aggregate purchase shortfall as a credit against the annual royalty owed to Patterson? (3) If Heidelberg is held to have defaulted under its royalty payment obligations, what remedies are available to Patterson?

For the reasons below, we hold: (1) Heidelberg owes Patterson $110,270.16 plus contract late payment interest; (2) Heidelberg may not offset these unpaid royalty damages based on the claimed 2022 aggregate purchase shortfall; (3) Patterson is entitled to its damages for 2022 royalties owed but is not entitled to terminate the parties' longstanding agreements.

**Arbitration Proceedings**

After Judge Kness' order compelling arbitration, Patterson brought this arbitration. Arbitrators were appointed under AAA rules and without objection by the parties. Scheduling conferences were held, with dates adjusted and readjusted to accommodate the parties, their counsel, and the arbitrators. The parties conducted substantial discovery, including document exchange and interrogatories. Motions concerning objections to document requests and interrogatories, and to privileges asserted were briefed and decided. The parties submitted extensive pre-hearing briefs accompanied by exhibits and authorities. Hearing exhibits were pre-marked and exchanged, along with witness lists, before the in-person Hearing on the Merits.

A full-day Hearing was held in Chicago on November 25, 2024. Matthew Vondra (Vice President of Southwind Industries, holding company for Patterson), John Harris (President of Southwind Industries, holding company for Patterson), and James Bottom (Vice President and General Manager of Heidelberg Illinois business unit) testified in-person. Cindy Swankoski (Heidelberg Business Analyst) testified by Teams. All were subject to direct and cross-examination, as well as questions from the arbitrators. At the end of the day all exhibits offered were admitted without objection. Both parties rested. The proceedings were transcribed by a court reporter and a transcript was provided to counsel and the Panel.

Follow-up questions from the Panel were sent to counsel. The parties responded to the Panel questions in detail and with citations to the record and copies of the caselaw they believed supported their positions. The Panel took the case under advisement, deliberated on the testimony, exhibits, and authorities received, and prepared this Award.

## Facts and Analysis

Under the Sales Agreement, Patterson granted Heidelberg certain rights to purchase aggregate materials mined and crushed by Patterson at its Joliet mine. Under the Supply Agreement, Heidelberg is required to sell Patterson (and Patterson is required to buy) certain aggregates that Heidelberg obtains and processes. Thus, the two parties buy and sell aggregates to each other.

### The Royalty and Credit Calculations

Section 4(c) of the Sales Agreement requires Heidelberg to pay Patterson an annual royalty (the "Royalty") in monthly installments. Royalty is defined as the greater of the Minimum Annual Royalty that is stated for each year or a certain percentage of net sales. Section 4(c)(ii) provides that if, by year's end, the monthly royalty payments total less than the Minimum Annual Royalty, then by January 31 of the next year, Heidelberg is to pay Patterson the difference between the two.

Section 4(c)(iii)(C) of the Sales Agreement provides that Heidelberg may receive a credit against the Minimum Annual Royalty if Patterson "fails to offer to purchase at least 500,000 tons of aggregates from Heidelberg under the *Supply* Agreement." (Emphasis added.) There are exceptions to this 500,000-ton purchase requirement, but the parties agree that none of those exceptions apply, so there is no need to consider them.

Section 4(c)(iii)(C) of the Sales Agreement also provides a formula for calculating the credit that Heidelberg may be entitled to receive:

"(i) 500,000 tons, <u>minus</u> any tons not offered to purchase . . . during such calendar year under the Supply Agreement, multiplied by (ii) $8.50 per ton, and multiplied by (iii) the Royalty Percentage applicable to the calendar year."

Section 4(c) of the Supply Agreement also addresses Heidelberg's potential credit. It states that if Patterson

> "fails to submit a Bonafide offer to purchase the Annual Quantity, or otherwise breaches this Supply Agreement, then in addition to all other remedies available . . . Heidelberg shall be entitled to a reduction in the Royalty under the [Sales] Agreement until Patterson satisfactorily remedies such failure or breach, which reduction shall be in accordance with the formula set forth in the [Sales] Agreement."

There is no dispute that Patterson submitted 2022 Bona Fide Offers to purchase the contractually prescribed 500,000-ton threshold. Heidelberg wrote to Patterson on January 23, 2023, that Patterson "actually purchased only 660,222 tons of Aggregates in 2022," but argues this still leaves an Annual Quantity shortfall of 117,936 tons. (C107, Tab B of Exhibits to Patterson Pre-Hearing Brief.) Heidelberg contends it is thus entitled to an offset credit of the $110,270.16 in dispute. Heidelberg's claim may have a plausible business justification. It is not supported by the text of the parties' 2016 Agreements, however. The parties might have agreed to amend their contract to provide for such an offset or other credit based on Bona Fide Offers/Purchases in excess of 500,000 tons but with actual purchases below the Annual Quantity of offers. They could also have agreed to compromise these claims as they did for 2020. (Memorandum of Settlement Agreement on 2020 Bona Fide Offer requirements, May 2021, Ex. R-12 in Exhibits to Respondent' Pre-Hearing Brief.)

It is not for the Panel to modify the parties' agreements or encourage a settlement of the 2022 dispute now before us. Based on the contract we conclude that Heidelberg is not entitled to a credit. Accordingly, Heidelberg owes Patterson $110,270.16 plus late payment interest. Under Sales Agreement Sec. 4(e) on late payments Patterson shall pay Heidelberg interest at the specified rate of 3% per annum for amounts due and unpaid 30 business days after written notice. Patterson's written Notice of Default is the letter from Harris to Bottom dated February 1, 2023, received by Heidelberg soon thereafter (Joint Exhibit 15); 30 business days later would be late March 2023 (3% on $110,270.16 for the 18 months from April 2023 through December 2024 is $4,962.15).

<u>Is Patterson Entitled to Terminate the Contracts?</u>

In addition to damages of $110,270.16, Patterson seeks a declaration that the Sales Agreement and the Supply Agreement are terminated. Patterson argues that Sec. 19(a)(i) of the Sales Agreement states that it shall be a Default "under this Agreement if (i) MSC [now Heidelberg] fails to pay any . . . Royalty . . . or any other sum required to be paid . . . and such failure remains uncured thirty (30) business days after [Heidelberg's] receipt of written notice . . . that the amount is due and unpaid." Here it is undisputed that Heidelberg received such written notice shortly after February 1, 2023, and did not cure the default by paying the $110,270.16 within the thirty-day time frame.

Patterson cites Sales Agreement Sec. 20 (Patterson Remedies) in support of its right to demand termination of the parties' agreements: "Upon a Default or Event of Default . . . Patterson at its option may . . . exercise any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity: (a) Patterson may terminate this Agreement and Term created thereby . . . ." Patterson has exercised that option in its court pleadings and this arbitration and asks the Panel to now enforce this remedy.

The Supply Agreement does not contain a default provision. Neither party addresses the consequence or seeming ambiguity of this fact, nor have the parties identified any provision integrating the January 1, 2016 Supply Agreement and February 1, 2016 Sales Agreement and their respective "Entire Agreement" terms. We acknowledge these questions but do not pursue them because we believe the availability of contract termination is best determined on other grounds discussed below.

Heidelberg denies that termination is appropriate. It argues that, under Illinois law, a breach must be material to justify termination of a contract and that Heidelberg's failure to pay $110,000 is not material given the nature and scope of the parties' contractual relationship.

The parties focus on whether under Illinois law Patterson must show that Heidelberg's breach of the Sales Agreement was material or whether Patterson can rely on the language of the Sales Agreement which says that "any" uncured default gives Patterson the right to terminate the parties' agreement.

Almost all the case law cited or referenced within the cases cited by the parties state that a breach must be material to justify termination. Illinois decisions hold that regardless of the language the parties use in their agreement, only a material breach can justify termination. *Wolfram Partnership, Ltd. v. LaSalle Nat. Bank*, 328 Ill.App.3d 207, 222-223. 765 N.E.2d 1012, 1025 (2001); *Hickox v. Bell*, 195 Ill.App.3d 976, 992, 552 N.E.2d 1133, 1143-44 (1990); see also for the general requirement and test of materiality, *InsureOne Independent Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, 976 N.E.2d 1014, 1027 (2012). Some of the cases cited by the parties also state that the law abhors termination because it is akin to a forfeiture. Both parties cite the *Restatement Second of Contracts* Sec. 241 (1981) on the standard for materiality. To the extent applicable, all of the factors identified preclude finding materiality here. Even the principal case relied on by Patterson, *Village of Fox Lake v. Aetna,* 178 Ill.App.3d 887, 534 N.E.2d 133 (1989), compared the amount arguably outstanding to subcontractors with the total size of the project contract and would have found the default here non-material. Heidelberg's $110,000 breach was not material in the context of the parties' long relationship and commerce covered by the contracts. The parties have engaged in millions of dollars of business over many years--$7 million in 2022 alone (Harris, Tr. 205), with $110,000 a very small percentage of the Joliet facility royalty revenues (Harris, Tr. 237-238), and a small portion of Heidelberg's gross revenues (Bottom, Tr. 298).

Under the facts presented here and Illinois caselaw that binds us and requires a material breach before granting a termination, we deny Patterson's request for a declaration that its 2016 aggregate contracts with Heidelberg are terminated.

**Attorney's Fees and AAA Costs**

Both parties pray for reimbursement of their reasonable legal fees in this arbitration and in the court litigation that preceded it. Neither side prevailed entirely in this dispute. Attorney's fee applications, review and assessment of those applications that could be largely offsetting would add unproductively to the time and cost of these proceedings. Toward the end of bringing the parties' dispute to a prompt and cost-effective conclusion, we decline to award attorney's fees.

Nonetheless, we have broad discretion to shift costs under Sales Agreement Sec. 14(c)(vii) and AAA Commercial Rules 49(c)(d) and 55. Given the totality of

Page 7

circumstances in this dispute, we direct that Heidelberg shall reimburse Patterson for the AAA administrative fees and expenses and the arbitrator compensation incurred by Patterson in this arbitration.

## <u>FINAL AWARD</u>

1. Claimant Patterson's prayer for contract damages against Respondent Heidelberg is GRANTED. Respondent Heidelberg shall pay Claimant Patterson $110,270.16 in damages plus late payment interest at the rate of 3% per annum until paid. For the 18-month period April 2023 through December 2024 interest owed is $4,962.15.

2. Claimant Patterson's request for a declaration that its 2016 Aggregate Sales and 2016 Marketing Agreement and Aggregate Supply Agreement are terminated is DENIED.

3. Each side shall bear its own attorney's fees.

4. The administrative fees and expenses of the American Arbitration Association totaling $8,250.00 and the compensation and expenses of the arbitrators totaling $101,590.00 shall be borne by Respondent Heidelberg. Therefore, Respondent Heidelberg shall reimburse Claimant Patterson the sum of $59,045.01 representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Patterson in this arbitration.

5. This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted in this Final Award herein are hereby DENIED.

SO ORDERED

Dated: February 5, 2025

_____
Peter V. Baugher, Chair Arbitrator


_____
Joseph M. Gagliardo, Arbitrator


_____
Mitchell L. Marinello, Arbitrator

SO ORDERED

Dated: February 5, 2025

_____
Peter V. Baugher, Chair Arbitrator

_____
Joseph M. Gagliardo, Arbitrator

_____
Mitchell L. Marinello, Arbitrator

SO ORDERED

Dated: February 5, 2025

_____

Peter V. Baugher, Chair Arbitrator

_____

Joseph M. Gagliardo, Arbitrator

_____

Mitchell L. Marinello, Arbitrator